**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NEERAJ BAXI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 10-cv-6346 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| ENNIS KNUPP & ASSOCIATES, INC.; | ) | |
| HEWITT ASSOCIATES, INC.; | ) | |
| AON CORPORATION; AON HEWITT; and | ) | |
| HEWITT ENNISKNUPP, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are two motions to dismiss Plaintiff's complaint, one filed by Defendant Hewitt Ennisknupp, Inc. [24] and one filed by Defendants Hewitt Associates, Inc., Aon Hewitt, and Aon Corporation [31]. For the following reasons, Defendant Hewitt Ennisknupp, Inc.'s motion [24] is granted in part and denied in part, and the Court gives Plaintiff 28 days from the date of this order to replead the counts that the Court has dismissed. The motion filed by the remaining Defendants [31] is respectfully denied.

**I.    Background**[1]

Ennis Knupp & Associates, Inc. ("Ennis Knupp") was an independent firm that provided investment consulting services to institutional clients. ¶ 24. Ennis Knupp was organized as a closely-held corporation. ¶ 35. Plaintiff Neeraj Baxi ("Plaintiff" or "Baxi") began his employment with Ennis Knupp in July 2000 as a senior investment analyst. ¶ 38. In 2002, Plaintiff was promoted to associate and was required to purchase 100 shares of Ennis Knupp for

---

[1] For purposes of Defendants' motions, the Court assumes as true all well-pleaded allegations set forth in the complaint. See, *e.g.*, *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). Unless otherwise specified, all citations in this section correspond to Plaintiff's complaint [1].

$10,000 (*i.e.*, $100 per share).  ¶ 39.  In 2005, Plaintiff became a Principal and was required to

purchase an additional 900 shares of Ennis Knupp for $90,000 (again, at $100 per share).  ¶ 39.

In 2006, Planitiff was awarded another 196 shares.  *Id.*  Ultimately, Plaintiff owned 1,196 shares

of Ennis Knupp, approximately 4% of the company.  *Id.*

On August 23, 2006, Plaintiff entered into a Third Restated and Amended Stock

Restriction and Purchase Agreement, which required Plaintiff to sell his shares back to Ennis

Knupp upon his separation from the company.  The 2006 Stock Restriction Agreement provides

in relevant part:

> Transfer Upon Termination of Employment.  [* * *]  [W]ithin ninety (90) days
> after the termination of employment by a Shareholder, the Corporation shall
> purchase all [* * *] of the Shares owned by said Shareholder as of the date of
> termination of his employment with [Ennis Knupp], and the person then holding
> such Shares shall sell them to the [Ennis Knupp], at the price and on the other
> terms and conditions hereinafter specified.

2006 Stock Restriction Agreement § 3, Ex. A to Defendant Hewitt Ennisknupp, Inc. f/k/a Ennis

Knupp & Associates, Inc. ("HEK") Memorandum [19].[2]  The 2006 Stock Restriction Agreement

defines the phrase "termination of employment" as the "voluntary or involuntary termination of a

Shareholder's employment with [Ennis Knupp] for any reason whatsoever (including death or

---

[2] HEK attaches seven exhibits to its memorandum, including the 2006 Stock Restriction Agreement.
None of these documents were attached to Plaintiff's complaint.  However, the Court may consider
Exhibits A – D because these documents are "'referred to in the plaintiff's complaint and are central to
[his] claim.'"  *Albany Bank & Trust Co. v. Exxon Mobil Corp.*, 310 F. 3d 969, 971 (7th Cir. 2002)
(quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993).  Exhibits A
and B comprise the agreement that governed Plaintiff's purchase of company stock.  Plaintiff references
this agreement in ¶ 5 of his complaint, and that contract is central to Plaintiff's claim.  Exhibit C is the
employment agreement with Ennis Knupp that Plaintiff admits that he signed in ¶ 42 of the complaint.
Plaintiff relies on this instrument for his contention that he could only be terminated in accordance with
Indian law.  The Court may consider it.  See *Rosenblum v. Travelbyus.com Ltd.*, 233 F.3d 657, 661-62
(7th Cir. 2002).  Exhibit D is an e-mail sent to Plaintiff by an Ennis Knupp executive.  Plaintiff quotes
from this e-mail in ¶ 52, discusses the e-mail's attachments in ¶ 50, and relies on the e-mail for a number
of his claims.  In his response, Plaintiff has not moved to strike *any* of the exhibits attached to HEK's
memorandum, and does not argue that any cannot be considered at this stage of the litigation.

retirement) at any time." *Id.* at § 1(h).  The ninth signature page of the 2006 Stock Restriction

Agreement contains Plaintiff's signature.  *Id.*

The 2006 Stock Restriction Agreement was amended in April 2008.  Plaintiff signed the

2008 Amendment.   See Ex. B. to HEK Mem.   The 2006 Stock Restriction Agreement, as

amended by the 2008 Amendment, provides in pertinent part:

> [T]he purchase price for each Share purchased by [Ennis Knupp] pursuant to the
> terms of this Agreement upon termination of [Plaintiff's] employment * * * shall
> be an amount equal to **the lesser of** (i) the Fair Market Value of such Share or (ii)
> (A) with respect to a Class A Share, the Capital Contribution paid by [Plaintiff]
> for each such Class A Share; provided, that the capital contributed in exchange for
> such Class A Share as of the date hereof shall be deemed to be equal to One
> Hundred Dollars ($100) and (B) with respect to a Class B Share, (x) if [Plaintiff]
> made a Capital Contribution for such Class B Share, the Capital Contribution paid
> by [Plaintiff] for each such Class B Share; provided that, the capital contributed in
> exchange for such Class B Share as of the date hereof shall be deemed to be equal
> to One Hundred Dollars ($100), (y) if [Plaintiff] did not make a Capital
> Contribution for such Class B Share, but accepted such Class B Share as
> compensation and paid income tax thereon, the amount of such compensation, as
> determined by the Board of Directors; provided, that each such compensation for
> one Class B Shaer as of the date hereof shall be deemed to be equal to One
> Hundred Dollars ($100) or (z) if the Shareholder was issued such Class B Share
> as a non-taxable distribution or dividend, One Hundred Dollars ($100) (the price
> that is the lesser of clauses (i) and (ii) above shall be referred to as the "Purchase
> Price").

*Id.* at § 2 (emphasis added).

Section 12 of the Stock Restriction Agreement (titled "Sale of the Corporation")

discussed the obligations of shareholders (like Plaintiff) in the event of a sale or merger.  Among

other things, § 12 provided that upon "the consummation of" a sale or merger of the company,

"all of the Shareholders holding a particular class or series of Shares shall receive the same form

and amount of consideration per share* * *."

In 2008, Plaintiff informed Ennis Knupp that he intended to leave the company and move

back to India.  ¶ 40.  At the time, Ennis Knupp was considering establishing a presence in India

and asked Plaintiff if he would manage the opening of Ennis Knupp's Indian office in Mumbai.

*Id.* Plaintiff agreed. He moved to India in March 2008. ¶ 42. In April 2009, Plaintiff entered into an employment agreement with Ennis Knupp & Associates India Private Limited ("EK India") related to his management of EK India ("The Employment Agreement"). *Id.* HEK attached a copy of the Employment Agreement as Exhibit C to its memorandum. The Employment Agreement provides in part: "[EK India] or you may terminate this appointment by giving one months notice in writing." Employment Agreement § 7.

In December 2009, Mr. Steve Voss, executive board member of Ennis Knupp ("Voss"), contacted Plaintiff to discuss the progress of the India office. ¶ 43. During their conversation, Voss told Plaintiff to "change the strategic direction of the Indian office." *Id.* Voss then "assured Mr. Baxi that he would have until, at the very least, November 2010 to show EK that the Indian office was capable of reaching its targets." *Id.* Plaintiff alleges that he "relied on Mr. Voss's representation about his employment and assured Mr. Voss that he would stay until at least November 2010 so that he could fulfill his duties to the company." ¶ 44. According to Plaintiff, this discussion constituted "a binding contract wherein Mr. Baxi was to be employed until November 30, 2010, at the very least." ¶ 101.

However, on February 1, 2010, Voss informed Plaintiff that Ennis Knupp was shuttering the Indian Office and asked Plaintiff to resign immediately. ¶ 45. During their conversation, Plaintiff asked why Ennis Knupp had changed strategy so suddenly and whether there was anything significant happening with the company. Voss told Plaintiff "that there was no concrete reason for the company reneging on its promise to keep the India office open until at least November 2010." ¶ 46.

Unbeknownst to Plaintiff, by February 2010 and before, Ennis Knupp was engaged in merger talks with Hewitt. ¶¶ 34, 46. Ennis Knupp decided to shut down the India office and

terminate Plaintiff not for "no concrete reason," but instead "in order to become a more attractive acquisition target" for Hewitt.  *Id.*  Plaintiff alleges that "[i]f Mr. Baxi had been told that this was the reason that EK was trying to buy back his shares he would not have resigned or sold his shares to EK."  *Id.*  Plaintiff alleges that during their phone call, Voss concealed at least three material facts: (1) that Ennis Knupp was in the midst of merger talks with Hewitt; (2) that there would be material changes to Ennis Knupp's ownership and management; and (3) that "if he continued to work at the company for just a few more months, instead of getting $119,600 for his shares, he would be entitled to approximately $1.5 million," when the merger was consummated.  ¶ 48.

> Subsequent to their discussion, Voss sent Plaintiff the following e-mail:
>
> Neeraj—the following are the separation documents just referenced during our conversation.  Please review these and consider how you would like to handle the separation.  Please note that this e-mail serves as notification of your separation from EK India and your separation and repurchase from Ennis Knupp as a shareholder.  In terms of time line, as discussed we anticipate a period where we would seek your assistance to close out events for EK India.  This would be followed by a severage package.  As it related to internal communication, the current best thinking is to make shareholders aware Wednesday evening and the rest of the firm sometime on Thursday.  I will keep you informed as to what is done and when.

¶¶ 50, 52; see Ex. D to Def. Mem. ("Voss E-mail").  Two draft separation letters were attached to the Voss E-mail for Plaintiff's consideration: (i) a resignation letter by which Plaintiff would tender his resignation from EK India, and alternatively, (ii) a termination letter which provided the requisite 30-day notice pursuant to Section 7 of the Employment Agreement that Plaintiff was being terminated due to Ennis Knupp's liquidation of EK India.  *Id.*; ¶¶ 50, 52.  Also attached to the Voss E-mail was a Stock Repurchase Agreement which set forth the terms by which Ennis Knupp would buy back Plaintiff's shares upon his separation from the company.  ¶ 50.

Ennis Knupp kept Plaintiff on their payroll until March 31, 2010. However, following that date, Plaintiff performed "over 250 hours of work for EK" in helping the company to shutter the Indian Office "without getting any compensation whatsoever." ¶ 54. "[U]ntil September 10, 2010 Mr. Baxi was still being asked to perform services for the company and, as of September 30, 2010 Mr. Baxi was still listed on EK's website as a member of the 'General Consulting Team.'" ¶ 7. According to Plaintiff, Ennis Knupp "needed Mr. Baxi to keep working for the company [long past the date of his termination] in order to comply with Indian laws regarding the winding up of the Mumbai office." ¶ 55.

Hewitt announced that it had entered into a definitive agreement to acquire Ennis Knupp on July 20, 2010. ¶ 24. On September 2, 2010, Hewitt announced that it had completed its acquisition of Ennis Knupp. ¶ 25.

Plaintiff's complaint is pled in eleven counts. Count I alleges a violation of Section 10(b) of Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b-5, 17 C.F.R. § 240.10b-5. In summary, Plaintiff alleges that Voss defrauded him by inducing him to sell his shares back to the company for $119,600 when Voss knew that those shares would be worth far more a few months later because of the impending merger with Hewitt. See ¶¶ 56-64. Count II is an Illinois state law claim for "breach of fiduciary duty" in connection with Plaintiff's sale of hire shares back to the company. See ¶¶ 65-69. Count III is a claim for "Violation of Labor Laws" for unpaid "wages, salary, bonuses, and commissions" for work that Mr. Baxi performed after March 31, 2010." ¶ 72. That count states that "Mr. Baxi's labor law claims are governed by the Illinois Wage Payment and Collection Act," or "in the alternative, Mr. Baxi's labor law claims are governed by India's labor law." ¶ 75. The complaint does not identify which portion of India's "labor law" governs Plaintiff's claims. Count IV (fraudulent inducement), Count V (negligent

misrepresentation), and Count VI (unjust enrichment) all specifically concern Plaintiff's sale of his Ennis Knupp shares. ¶¶ 78-99. Count VII (breach of contract) alleges that "[i]n December 2009, Mr. Baxi and EK had a binding contract wherein Mr. Baxi was to be employed until November 30, 2010, at the very least * * * and EK breached [by] failing to pay Mr. Baxi his salary until November 30, 2010." ¶¶ 101-102. Count VIII and IX are both for "breach of the covenant of good faith and fair dealing." Count VIII involves Ennis Knupp's failure to keep Plaintiff employed "until November 30, 2010, at least." ¶ 105. Count IX is for a breach of the covenant of good faith and fair dealing implied in the "binding contracts" that Mr. Baxi entered into "[i]n 2002, 2005, and 2006 * * * wherein Mr. Baxi received a total of 1196 shares of EK stock * * * so that he could participate in the economic growth of the company." ¶ 110. Count X (promissory estoppel) is for the breach of Ennis Knupp's "clear and unambiguous promise to Mr. Baxi that he would be employed by EK until at least November 30, 2010." ¶ 115. Although it is difficult to ascertain from the pleading, Count XI (quantum meruit) also appears to concern the work that Mr. Baxi provided to Ennis Knupp after March 31, 2010.[3]

## II. Legal Standard

Defendants move to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). A motion to dismiss tests the sufficiency of the complaint, not its merits. See, *e.g.*, *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a Rule 12(b)(6) motion to dismiss, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ.

---

[3] There are two separate bases for Federal jurisdiction for this lawsuit. Count I is a claim for violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b-5, 17 C.F.R. § 240.10b-5. See 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a) (supplemental jurisdiction over the state law claims). Further, diversity jurisdiction exists, as Plaintiff is a citizen of a foreign state, Defendants are citizens of Delaware and Illinois, and the amount in controversy exceeds $75,000. See 28 U.S.C. § 1332(a)(2).

P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Bell Atlantic*, 550 U.S. at 569 n.14). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic*, 550 U.S. at 563. In other words, the pleading must allege facts that plausibly suggest the claim asserted. *Twombly*, 550 U.S. at 570. "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 555). As noted above, the Court accepts as true all well-pleaded facts alleged by Plaintiff and all reasonable inferences that can be drawn therefrom. See *Barnes v. Briley*, 420 F.3d 673, 677 (7th Cir. 2005).

Allegations of fraud, such as the allegations made in support of Plaintiff's securities fraud and fraudulent misrepresentation claims, are subject to the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b). *In re Healthcare Compare Corp. Sec. Litig.*, 75 F.3d 276, 280-81 (7th Cir. 1996). Plaintiffs must plead the circumstances constituting fraud with particularity. Fed. R. Civ. P. 9(b). They must identify the person who made the misrepresentation; the time, place, and content of the misrepresentation; and the method by which the misrepresentation was communicated. *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994); see also *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (fraud must be pled with particularity by providing the who, what,

when, where, and how). The stringent pleading requirement under Rule 9(b) serves three main purposes: "'to protect defendants' reputations, to prevent fishing expeditions, and to provide adequate notice to defendants of the claims against them.'" *SEC v. Buntrock*, 2004 WL 1179423, at *3 (N.D. Ill. May 25, 2004) (quoting *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 815, 819 (N.D. Ill. 2000)).

## III.   Analysis[4]

### A.   Securities Fraud

Count I of the complaint asserts violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and the SEC's Rule 10(b)(5), 17 C.F.R. 240.10b-5. "Section 10(b) * * * forbids the 'use or employ, in connection with the purchase or sale of any security * * * [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.'" *Tellabs*, *Inc. v. Makor Issues & Rights*, *Ltd.*, 551 U.S. 308, 318 (2007) (quoting 15 U.S.C. § 78j(b)). Rule 10b-5 also forbids a company or an individual "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). "The elements of a Rule 10b-5 claim are: (1) defendants made a false statement or omission; (2) of a material fact; (3) with scienter; (4) in connection with the purchase or sale of securities; (5) upon which the plaintiffs justifiably relied; and (6) that the false statement proximately caused the plaintiffs' damages." *In re Ulta Salon, Cosmetics & Fragrance, Inc. Securities Litigation*, 604 F. Supp. 2d 1188, 1194-95 (N.D. Ill. 2009) (citing *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (1997)).

---

[4] Defendants Hewitt Associates, Inc., Aon Corporation, and Aon Hewitt adopt and incorporate the arguments made in HEK's motion to dismiss.

Count I turns in large part on the extent to which this case is like *Jordan v. Duff and Phelps*, 815 F.2d 429, 435 (7th Cir. 1987).  In that case, the Seventh Circuit held that Rule 10b-5 prohibits closely-held corporations (like Ennis Knupp) from withholding news of a merger from their shareholder-employees if news of that merger might affect the shareholder-employees' decisions about when to leave employment and sell their shares.  See *Jordan*, 815 F.2d at 435. The rationale in *Jordan* follows from the Seventh Circuit's "special facts" doctrine, which imposes a fiduciary duty on closely-held corporations to disclose material facts known to the corporation but unknown to the minority shareholder when purchasing company stock from that minority shareholder.  *Id.*  Courts have held that the existence of merger negotiations is the kind of fact that, when known to the corporation but not the minority shareholder, must be disclosed prior to the corporation's purchase of the minority shareholder's stock.  See *e.g.*, *Jordan*, 815 F.2d at 434; *Michaels v. Michaels*, 767 F.2d 1185, 1196 (7th Cir. 1985).  And when an employee's departure from his employer will trigger the sale of stock back to his employer, the departure itself "is an investment decision as much as it is an employment decision." *Jordan*, 815 F.2d at 437 ("The securities acts apply to investment decisions, even those made indirectly or bound up with other decisions, such as employment or entrepreneurship.").

Because Count I is for securities fraud, "[t]here must be an 'investment' *decision*, to be sure." *Jordan*, 815 F.2d at 437 (citing *Rand v. Anaconda-Ericsson, Inc.*, 794 F.2d 843 (2d Cir. 1986); *Harris Trust & Savings Bank v. Ellis*, 810 F.2d 700, 703-04 (7th Cir. 1987)) (emphasis added).  A brief discussion of the facts in *Jordan* may be helpful to elucidate this requirement. Jordan was an employee of Duff & Phelps ("D&P"), a closely-held company, who was permitted to purchase 188 shares of D&P stock as part of his compensation package.  *Jordan*, 815 F.2d at 432.  Under the applicable stock purchase agreement, termination of employment with D&P for

any reason would trigger an automatic buyback of Jordan's shares. *Id.*

On November 16, 1983, Jordan told Hansen, the chairman of the D&P Board, that he was resigning to accept a job with another firm. *Jordan*, 815 F.2d at 432. Jordan did not ask Hansen about any potential mergers and Hansen did not volunteer any such information, although Hansen knew that: (1) D&P's negotiators had recently reached a merger agreement with Security Pacific, which the D&P board subsequently vetoed, that placed a value of $50 million on D&P; and (2) the D&P board had decided two days earlier to solicit other bids for the firm. *Id.* at 432-33.

By mutual agreement, Jordan worked for D&P for the rest of the year so that his stock would be bought back at its December 31, 1983 value, not its value at year end 1982, as it would have been under the stock purchase agreement had he left before the end of 1983. *Jordan*, 815 F.2d at 432. Between the date of Jordan's resignation and his actual departure from the firm, negotiations between D&P and Security Pacific resumed in earnest and the D&P board adopted a resolution that modified the stock purchase agreement to allow employees who were fired by the firm to retain their stock for five years thereafter, neither of which was disclosed to Jordan. *Id.* at 432-33.

Jordan sued D&P, claiming that it had violated federal securities laws by failing to disclose information that was material to his decision to sell his D&P stock back to the company. The district court granted summary judgment to D&P and the Seventh Circuit reversed in a 2-1 decision authored by Judge Easterbrook. (Judge Cudahy filed a concurring opinion and Judge Posner a dissent). In the majority's view, D&P had a duty under federal law to disclose material information to Jordan and a reasonable jury could conclude that the information D&P had withheld was, indeed, material to Jordan's *decision* to resign and terminate his ownership of

D&P stock.  *Jordan*, 815 F.2d at 437.  An essential predicate of Jordan's securities fraud claim was that he had a "choice" about when to leave D&P, and accordingly, on what date his stock sale would be triggered.  *Id.*

The converse of the rule from *Jordan* and similar cases is that when a shareholder is contractually obligated to sell his shares upon being properly terminated, whatever he knew or did not know about the company's future plans or how those plans would potentially impact the value of his shares is irrelevant.  See *Blackett v. Clinton E. Frank, Inc.*, 379 F. Supp. 941, 947 (N.D. Ill. 1974) ("Since the plaintiff was obligated by the 1969 Stock Purchase Agreement to sell his shares of CEF at the time of his termination, whatever he knew or did not know regarding CEF's plans to go public, issue a dividend and have a stock split was irrelevant.  Clearly the plaintiff has not properly alleged, nor do the relevant pleadings support a conclusion, that the plaintiff was fraudulently induced into selling his shares of CEF by the material misrepresentation made by the defendants.  In fact, the plaintiff apparently had no choice in the matter; he was obligated to sell his stock pursuant to the provision of the 1969 Stock Purchase Agreement as soon as his employer CEF had terminated his services."); see also *Ryan v. J Walter Thompson Co.*, 453 F.2d 444, 447 (2d Cir. 1971) ("since [the plaintiff] was obligated to sell his shares to [the defendant] in January 1969, whatever he knew or did not know regarding [the defendant's] plans to go public was irrelevant."); *Menides v. The Colonial Group, Inc.*, 681 F. Supp. 965, 970-71 (D. Mass. 1987) (discussing and following *Blackett*); *St. Louis Union Trust Co. v. Merrill Lynch*, 562 F.2d 1040, 1051 (8th Cir. 1977) ("Obviously, neither objective materiality nor subjective reliance is present here. Plaintiffs were contractually bound to sell their shares to (the company) upon termination of their employment. They had no choice in this matter at the time of the operative events in this case. Clearly, the alleged fraud could not have

influenced a reasonable man's decision to sell his stock to (the company) after termination when that man had previously committed himself to such a sale; nor could plaintiffs themselves have relied on allegedly fraudulent acts occurring long after plaintiffs had contracted to make the sale in question."). In a similar vein, if an employee is entitled only to a fixed price for his shares, the fact that information about the shares' fair market value is withheld from the employee could not cause the employee any loss. See *Ulta Salon, Cosmetics & Fragrance*, 604 F. Supp. 2d at 1194-95 (causation between false statement and plaintiff's damages essential element of securities fraud claim).

If Plaintiff had owned his shares of Ennis Knupp when its acquisition by Hewitt was finalized (on or around September 2, 2010), his shares would have been worth (and he would have been entitled to) approximately $1.5 million. Cmplt. at ¶ 48; see also Stock Restriction Agreement at § 12(b) (providing that upon a Sale of the Corporation (which includes a merger), shareholders would receive consideration for their shares on a pro rata basis based on the number of shares sold). Plaintiff's securities fraud claim therefore turns on whether Plaintiff had a *choice* about whether to hold on to his shares through the time of the merger. For, if Plaintiff had no choice but to be terminated in early February, 2010, any falsehoods that Voss told him, or information that Voss withheld from him, could not have affected the date on which Plaintiff sold his shares or the price that he received for them. Conversely, if Plaintiff had some right (contractual or otherwise) to remain employed with Ennis Knupp, the fact that Voss duped him into resigning early could have prevented Plaintiff from enjoying the benefits of the Hewitt acquisition.

HEK argues that Voss "made clear" in his conversation with Plaintiff on February 1, 2010, and in the follow-up e-mail, that [Plaintiff] had no choice to continue his employment

relationship with Ennis Knupp." HEK Mem. at 8. Indeed, the Voss e-mail, on its face, served as "notification of your separation from EK India and your separation and repurchase from Ennis Knupp as a shareholder." Plaintiff's written employment agreement provided that Ennis Knupp could properly terminate Plaintiff at any time "by giving one months notice in writing," Employment Agreement § 7, and the Stock Restriction Agreement required Plaintiff to sell back his shares within 90 days following that event for *the lesser of* (i) the fair market value of such shares or (ii) $100 per share.[5] Stock Restriction Agreement §§ 3, 5. According to HEK, because Plaintiff had no choice but to be terminated on February 1, he had no choice but to sell his shares 90 days thereafter, and at a fixed price of $100 per share. See *Jordan*, 815 F.2d at 447-48 (without an "employment contract or * * * the right to retain his stock after ceasing to be an employee, [t]he company could have told him everything yet still have prevented him from benefiting from the information, by firing him.") (Posner, J., dissenting).

In his response brief, Plaintiff argues that HEK cannot argue that "Baxi had no choice but to end his employment with EK within one month of notice being given on February 1, 2010, and no choice but to sell his shares back to EK at the end of his employment" because such an argument "contradicts the factual allegations of the complaint." Pl. Resp. at 4. Plaintiff offers two principal reasons why, had Voss informed him about the merger and candidly disclosed that Plaintiff's shares would be worth about $1.5 million once the merger closed, Plaintiff would have been able to insist on remaining employed at Ennis Knupp. Had either of these reasons been adequately pled, Plaintiff may have stated a claim for securities fraud. But because neither is, Plaintiff's securities fraud claim is dismissed, but without prejudice to repleading. The Court will address these reasons in turn.

_____

[5] Plaintiff does not deny that he is bound by the Stock Restriction Agreement or Employment Agreement, or argue that either is somehow invalid.

1. <u>Oral Contract</u>

Plaintiff's April 2009 written Employment Agreement with Ennis Knupp provided that either party could terminate the employment relationship "by giving one months notice in writing." Employment Agreement § 7. However, Plaintiff argues that in December 2009, Voss "assured Mr. Baxi that he would have until, at the very least, November 2010 to show EK that the Indian office was capable of reaching its targets." *Id.* Plaintiff alleges that he "relied on Mr. Voss's representation about his employment and assured Mr. Voss that he would stay until at least November 2010 so that he could fulfill his duties to the company." ¶ 44. According to Plaintiff, this discussion constituted "a binding contract wherein Mr. Baxi was to be employed until November 30, 2010, at the very least." ¶ 101. Plaintiff argues that if told about the merger discussions, he would have insisted on remaining employed through the end of November; and the obligation to sell his shares would not have kicked in until early 2011—long after the Hewitt merger was consummated.

To establish a breach of contract under Illinois law a plaintiff must plead and prove that "a valid and enforceable contract existed, that the plaintiff[] performed [his] contractual duties but the defendants breached theirs, and that the plaintiff[] [was] injured as a result." *BI3, Inc. v. Hamor*, 2011 WL 1231156, at \*6 (N.D. Ill March 30, 2011).[6] In order to be formed, employment contracts, like other contracts, require an offer, acceptance, and consideration. *Zemke v. City of Chicago*, 100 F.3d 511, 513 (7th Cir. 1996). However, "under Illinois law, oral employment contracts are viewed more skeptically than written ones." *Zemke*, 100 F.3d 511, 513 (7th Cir. 1996) (citing *Tolmie v. United Parcel Service, Inc.*, 930 F.2d 579 (7th Cir. 1991)). "To be enforceable, an oral contract must contain terms which are definite and certain." *Id.*; see

---

[6] Both parties cite Illinois law throughout their respective memoranda.

also *Magid Mfg. Co., Inc. v. U.S.D. Corp.*, 654 F. Supp. 325, 332 (N.D. Ill. 1987). "In addition to saving the judiciary from the very difficult task of reconstructing *ex post facto* the uncertain terms of an uncertain agreement, the requirement of a clear and definite offer prevents employers from incurring contractual liability for informal statements that were never intended to be anything more than expressions of long continuing good will and hope for eternal association." *Tolmie*, 930 F.2d at 581 (internal citations and quotations omitted). On a motion to dismiss, "the analysis is objective, not subjective; Illinois law seeks to determine whether the alleged promise is 'clear enough that an employee would reasonably believe that an offer has been made.'" *Id.* (quoting *Duldulao v. Saint Mary of Nazareth Hosp. Center*, 505 N.E.2d 314 (1987)). Courts applying Illinois law properly dismiss complaints alleging the existence of an oral contract where the material terms of the alleged contract are vague, unclear, or indefinite. See *Zemke*, 100 F.3d at 513; *Tolmie*, 930 F.2d at 581 (claim for breach of oral employment contract properly dismissed where alleged offer was vague and not "clear and definite," under "more scrutinizing" analysis applicable to oral employment contracts); *Robinson v. BDO Seidman, LLP*, 854 N.E.2d 767, 771-72 (Ill. App. 1st Dist. 2006) (oral agreement to employ plaintiff "as long as it takes to successfully build the department" not sufficiently "clear and definite" to state claim for breach of employment contract). "When the material terms and conditions are not ascertainable no enforceable contract is created. The court will not supply missing essential terms to an alleged contract." *Magid*, 654 F. Supp. at 332; see also *McErlean v. Union Nat'l Bank of Chicago*, 414 N.E.2d 128, 132-33 (Ill. App. Ct. 1st Dist. 1980).

Applying the standard from the cases cited above, Plaintiff's allegations are too vague and indefinite to support the existence of an oral agreement guaranteeing Plaintiff employment through the end of November 2010. Most importantly, Plaintiff's complaint does not

specifically allege that Voss promised not to fire him until the end of November 2010, if Plaintiff agreed to stay on. Instead, Plaintiff only alleges that Voss told him that he "would have until, at the very least, November 2010 to show EK that the Indian office was capable of reaching its targets." Cmplt. at ¶ 43. Even with the benefit of all inferences read in his favor, this statement cannot bear the weight that Plaintiff seeks to place on it—Voss's words cannot reasonably be construed as an offer of secured, termination-proof employment through the end of November 2010. That Plaintiff subjectively considered Voss's words to be an assurance of continued employment is of no moment, see *Tolmie*, 930 F.2d at 581, for as an objective matter, a statement that Plaintiff would have "until, at the very least, November 2010" to complete a task is not the same as a promise not to fire Plaintiff before that time.

Further, even if Voss's alleged statement was a promise not to terminate Plaintiff until the end of November 2010, Plaintiff's complaint does not plead the other terms of the alleged new, oral contract. For instance, Plaintiff does not indicate whether the other terms of the written Employment Agreement would continue, or whether the purported oral contract would supplant that agreement in its entirety. Similarly, Plaintiff does not indicate what his salary would be under the new oral contract. See *Zemke*, 100 F.3d at 513 (affirming dismissal of complaint where purported oral contract failed to allege start date or what employee's salary would be). For all of those reasons, Plaintiff has not properly alleged that he had a contractual right to contest his termination and remain employed at Ennis Knupp, that he would have asserted had he been appraised of Ennis Knupp's discussions with Hewitt. Plaintiff is given 28 days to replead if he believes that he can state a claim based on an oral contract.

## 2. Ennis Knupp Needed Plaintiff's Services Through September 2010

Next, Plaintiff argues that if he had not voluntarily resigned on February 2, "EK would [not] have fired him" because EK "needed Baxi's services through at least September 2010 in order to properly wind down its India office and in order to comply with Indian law." Pl. Mem. at 5 (citing Cmplt. at ¶¶ 52-55). According to Plaintiff, Ennis Knupp was in a pickle—they absolutely required his services through September 2010, yet wanted to clear him from the stockholder rolls before their deal with Hewitt was effectuated. In Plaintiff's view, Ennis Knupp purported to fire Plaintiff in February, yet fraudulently induced him to keep working through September. Had Ennis Knupp told Plaintiff about the merger, he would have communicated his refusal to keep working past the date of his termination. According to Plaintiff, "[i]t is a reasonable inference that had Baxi refused to keep working after his termination, EK would have had no choice but to relent in its decision to terminate Baxi." Instead, they would have been forced to keep him employed through September 2010.

Although this is a close call, and may well be curable in an amended pleading, the Court concludes that the current factual allegations of the complaint do not sufficiently support the inference that had Plaintiff known about the merger discussions, he would have had the leverage to force Ennis Knupp to keep him employed through September 2010. As explained below, while Plaintiff's contention is at least theoretically possible, he has not alleged a sufficient factual basis to lift his supposition beyond the speculative realm and into the area of plausibility, as Rule 8 requires. Because Plaintiff may be able to satisfy the federal pleading standards with additional detail, he will be given leave to replead if there is more to the story. See *Jordan*, 815 F.3d at 435 (noting that despite his resignation, Jordan was "entitled to an opportunity to demonstrate that he could have remained at the firm").

There is no uniform playbook for the end game of an employment relationship. Sometimes, when an employee is fired, he is escorted out of the building *post haste*. That is because a company generally does not "want a viper in its nest," *Jordan*, 815 F.2d at 436, with access to company information and employees. In other instances, as was the case in *Jordan*, the employer and employee negotiate a transition period. *Id.* at 432. That is what Plaintiff alleges happened here. Specifically, the complaint alleges that Ennis Knupp asked Plaintiff to stay on the payroll until March 31 and engaged him to perform certain unnamed services until September 10, 2010 (Cmplt. at ¶ 54). Those allegations suggest that Ennis Knupp did desire Plaintiff's assistance through that time.

However, the inference that Plaintiff was so vital that Ennis Knupp *would not*—or effectively *could not*—have fired him is too attenuated an inference for the Court to make from the facts as they are currently pled. Plaintiff does not indicate how, without his assistance, Ennis Knupp would have been unable to "comply with Indian laws regarding the winding up of the Mumbai office." *Id.* at ¶ 55. Similarly, Plaintiff does not allege why Ennis Knupp needed *him* to wind down the Mumbai office, as opposed to sending someone else from the company or engaging an Indian attorney to perform those tasks. The factual allegations that would give Plaintiff's argument the requisite plausibility, see *Concentra Health Servs.*, *Inc.*, 496 F.3d at 776, are within Plaintiff's personal knowledge—presumably he is aware of what work he performed between February and September 2010, and why that work was so vital to the company that he was essentially irreplaceable during that time. Plaintiff also would know which laws he believes Ennis Knupp surely would have violated without his presence.[7] If such allegations were

---

[7] Plaintiff briefly raises a third argument. Had Plaintiff forced Ennis Knupp to fire him, and had he held on to his shares for as long as the contract permitted, Ennis Knupp would have been forced to wait 120 days before it could force Plaintiff to sell back his stock (30 days notice prior to termination, and 90 days after termination to sell back the shares). Plaintiff argues in his response that because "EK was desperate

properly pled and proven, "a jury would be entitled to conclude that [Plaintiff] would have stuck around," *Jordan*, 815 F.2d at 441, through the time of the merger.

*      *      *

For the reasons explained above, Plaintiff has failed to properly allege that, if not for Ennis Knupp's alleged fraud, he would have been able to remain employed at Ennis Knupp through the time of the merger in September 2010. Without such a properly-pled allegation, Plaintiff's complaint establishes only that he was terminated in accordance with his employment-related contracts, and was subject to the automatic re-sale requirement in the Stock Restriction Agreement. Plaintiff had no investment "decision" to make, and so his securities fraud claim is subject to dismissal. *Blackett*, 379 F. Supp. at 947. Similarly, under Plaintiff's agreements with Ennis Knupp, upon properly terminating him, the company could (and did) purchase Plaintiff's shares for $100 per share (for a total of $119,600), irrespective of the shares' fair market value. What information Voss told (or omitted from) Plaintiff is irrelevant; Plaintiff was entitled to precisely $119,600 in any case. However, consistent with the discussion above, Plaintiff is given leave to replead within 28 days if he believes that a more robust exposition of relevant facts can state a plausible claim.

### B.      Breach of Fiduciary Duty

Many of Plaintiff's state law claims that involve his sale of Ennis Knupp stock fail for the same reason as does his securities fraud claim. Count II is for "breach of fiduciary duty." To

---

to buy Baxi's shares before the merger with Hewitt was consummated * * * it is a reasonable inference that EK intentionally delayed its acquisition by Hewitt, which was announced in July, in order to first clear Baxi and other shareholders from its rolls." Pl. Mem. at 5. This argument does not save his securities claim, at least as it is currently pled. First, Plaintiff does not allege in his complaint that Ennis Knupp intentionally delayed the merger, and his brief points to no factual allegations sufficient to support such a conclusion. And in any event, Hewitt announced the acquisition of Ennis Knupp on July 20, 2010 (Cmplt. at ¶ 24), which is 158 days after Plaintiff resigned and sold back his shares. Plaintiff does not explain why Ennis Knupp would have to "delay" at all, having already "cleared [Plaintiff * * *] from its rolls."

plead such a claim under Illinois law, Plaintiff must allege (1) that a fiduciary duty exists; (2) the fiduciary duty was breached; and (3) damages proximately resulted from the breach. *Northern Trust Co. v. MS Securities Services, Inc.*, 2006 WL 695668, at *11 (N.D. Ill. March 15, 2006). Here, Plaintiff contends that as a minority shareholder, Ennis Knupp owed him a "duty to reveal all material information about the future of the company when they were negotiating Baxi's resignation package" (Cmplt. at ¶ 67) and that Ennis Knupp's "insiders" breached their fiduciary duty by making the purported misrepresentations and omissions in Baxi's securities fraud claim. *Id.* at ¶ 68. Count II fails because, as the complaint is currently pled, Plaintiff cannot show that these alleged breaches—the same alleged misrepresentations and omissions that serve as the foundation for his securities fraud claim—proximately caused him any damage. Again, this is because the price that Plaintiff received for his shares was preset by contract, and was not tied to the market value of the stock. An amended complaint may be able to salvage this claim as well.

### C. Fraudulent Inducement and Negligent Misrepresentation

To state a claim for fraudulent inducement under Illinois law (Count IV), Plaintiff must allege that "(1) [defendant] made a false statement of material fact; (2) [defendant] knew that the statement was false; (3) the statement was intended to induce [plaintiff's] reliance; (4) the statement induced [plaintiff's] reasonable reliance; and (5) the statement caused damage to [plaintiff]." *CPE SA v. Wilton Industries, Inc.*, 2010 WL 850179, at *2 (N.D. Ill. March 3, 2010). Plaintiff alleges that Ennis Knupp "induced Mr. Baxi to sell his shares back to the company for just $119,600" by making the misrepresentations and omissions that form the basis of his securities fraud claim. Cmplt. at ¶ 80. Ennis Knupp allegedly "made these representations in order to induce Mr. Baxi into selling his shares for over $1 million less than they were actually worth." *Id.* at 81. However, for the reasons explained above, the current allegations of the

complaint do not plausibly suggest that Ennis Knupp's allegedly-false statements induced in Plaintiff any reliance, for the contract required Plaintiff to resell his shares upon being terminated, and he has not adequately alleged that he had the right or even a reasonable prospect of avoiding that fate. Similarly, Plaintiff could not show that Ennis Knupp's allegedly-false statements caused him any damage; for under the terms of the applicable contracts, Plaintiff was contractually required to resell his shares long before the merger closed, and was then entitled to no more than $100 per share.

Count V (negligent misrepresentation) fails for the same reasons; elements of a negligent misrepresentation claim include reliance and damage to the plaintiff resulting from reliance on a negligently-made statement. *Neptuno Treuhand-Und Verwaltungsgesellschaft Mbh. v. Arbor*, 662 N.E.2d 812, 815 (Ill. App. Ct. 1st Dist. 1998) ("under Illinois law, the elements a plaintiff needs to plead and prove in a fraudulent misrepresentation complaint are: (1) a false statement of material fact; (2) knowledge or belief of the falsity by the party making it; (3) an intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statements; and (5) damage to the other party resulting from such reliance.").

Again, if Plaintiff could adequately plead an oral contract and/or provide a plausible basis for inferring that Ennis Knupp could not (or would not) have fired him until after the merger because his services were indispensible, he may be able to overcome these hurdles and state a claim as to Counts IV and V.

### D. Unjust Enrichment

Count VI (unjust enrichment) alleges that Ennis Knupp was unjustly "enriched by an amount no less than the difference in price of the shares that Mr. Baxi sold EK on February 2, 2010 and the price that Hewitt paid for those shares when the acquisition was completed."

Cmplt. at ¶ 96. Unjust enrichment is a "quasi-contract" claim that allows courts "to imply contracts in order to prevent injustice." *Song v. PIL, LLC*, 640 F. Supp. 2d 1011, 1015 (N.D. Ill. 2009) (citing *Hayes Mechanical Inc. v. First Indus., L.P.*, 812 N.E.2d 419, 426 (Ill. App. Ct. 1st Dist. 2004). To state a claim for unjust enrichment under Illinois law, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Id.* at 1015-16. However, under Illinois law, "[w]hen two parties' relationship is governed by contract, they may not bring a claim of unjust enrichment unless the claim falls outside the contract." *Utility Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 688-89 (7th Cir. 2004). "In determining whether a claim falls outside a contract, the subject matter of the contract governs, not whether the contract contains terms or provisions related to the claim." *Id.* Here, there are two express contracts that unambiguously govern the repurchase of Plaintiff's shares by Ennis Knupp—the Stock Restriction Agreement and the stock repurchase agreement that Plaintiff signed to effectuate the sale on February 2, 2010. For this reason, Count VI is dismissed.

>        **E.**      **Breach of Oral Employment Contract**

For the reasons discussed in Section III.A.1, Count VII (which is for breach of the oral employment agreement) is dismissed without prejudice to repleading. In his complaint, Plaintiff admits that Count VIII (breach of good faith and fair dealing with regard to the oral employment contract) does not "state[] a claim distinct from the Seventh Cause of Action" and requests leave to amend the complaint to combine both Counts into a single cause of action, presumably for breach of contract. Pl. Resp. at 15 n.2. Plaintiff may correct this pleading error in an amended complaint; for the time being, Count VIII is dismissed as well.

**F.     Breach of the Covenant of Good Faith and Fair Dealing in the Share Allocation Agreements**

Next, Count IX is styled "breach of the covenant of good faith and fair dealing."  Plaintiff alleges that "[i]n 2002, 2005, and 2006, Mr. Baxi and EK entered into binding contracts wherein Mr. Baxi received a total of 1196 shares of EK stock that were granted to Mr. Baxi so that he could participate in the economic growth of the company."  Cmplt. at ¶ 110.  By "tricking Mr. Baxi into selling the shares back at less than fair value," Ennis Knupp allegedly violated "the covenants of good faith an fair dealing with regard to the valid and binding contracts that allocated [Plaintiff] the 1196 EK shares."  *Id.* at ¶ 113.

As a formalistic matter, Count IX is dismissed because "under Illinois law, the covenant of good faith and fair dealing is merely an aid to contract interpretation, and does not provide a basis for an independent cause of action."  *Laff v. Best Buy Stores, L.P.*, 2010 WL 2220581, at *3 (N.D. Ill. June 3, 2010) (dismissing count alleging breach of good faith and fair dealing); *Zeidler v. A & W Restaurants, Inc.*, 301 F.3d 572, 575 (7th Cir. 2002) (noting that the district court correctly dismissed the plaintiff's claim that the defendant breached an independent covenant of good faith and fair dealing because that covenant is "not a source of contractual duties or liability under Illinois law."); see also *Echo, Inc. v. Timberland Machines & Irrigation, Inc.*, 2009 WL 562539, at *3 (N.D. Ill. March 5, 2009) (dismissing breach of good faith and fair dealing claim because "it is not an independent cause of action under Illinois law;" and noting that while "[i]n Illinois, contracting parties are held to an implied duty of good faith and fair dealing," that obligation "is mainly used as a construction aid to determine the intent of the parties in case of conflicting terms") (citing cases).

However, in his response brief (at 17), Plaintiff discusses his ninth cause of action in terms of a "breach of the contracts granting Baxi shares in EK."  Once Plaintiff corrects the

pleading error discussed in the preceding paragraph, and clarifies the basis for Count IX, Plaintiff *may* be able to state a claim for breach of those agreements. The authority for such a claim again comes from *Jordan*. In *Jordan*, Judge Easterbrook's majority opinion reasoned that even in "at will" employment contracts, Illinois law places some limits on an employer's ability to discharge an employee. 815 F.2d at 438. "One term implied in every written contract and therefore, we suppose, every unwritten one, is that neither party will try to take opportunistic advantage of the other." *Id.* As a result, Judge Easterbrook posited that had D&P fired Jordan just before the merger solely to enrich the other shareholders, it would have breached this implied contractual duty. *Id.* at 439. Even if that discussion could be considered to be *dicta*, see *Hannon v. Leo Burnett Co., Inc.*, 2001 WL 629334, at *3 (N.D. Ill. 2001); *Fanning v. Kemper Corp.*, 1988 WL 17568, at *4-5 (N.D. Ill. Feb. 23, 1988), "[t]hat *dicta* suggests * * * that if an employer were to fire an at-will employee immediately before a merger solely to prevent him from reaping the anticipated profit on the company's stock it would violate its duty not to engage in opportunistic misconduct." *Hannon*, 2001 WL 629334, at *3; see also *Stromberger v. 3M Co.*, 990 F.2d 974, 978 (7th Cir. 1993) (describing holding of *Jordan* as finding "an implied contractual right that [defendant] had winkled him out of by failing to disclose information that might have dissuaded him from quitting"). Therefore, irrespective of any investment decision that Plaintiff made (or did not make), and irrespective of any allegedly-false statements or omissions, Plaintiff *may* be able to state a claim that accuses Ennis Knupp of "opportunistic misconduct" in violation of his contracts with them.

Because the Court has dismissed Count IX for the reason discussed above, it need not decide at this time whether Illinois law indeed supports such a claim. See *Fanning*, 1988 WL 17568, at *4 (expressing "reservations about utilizing *Jordan's* discussion

of opportunistic advantage"). And without the benefit of further briefing on this issue from the parties, the Court is unwilling to decide in the hypothetical whether such a theory is legally cognizable.

### G. Labor Law Claims

In Count III, Plaintiff alleges that "EK unlawfully did not pay Mr. Baxi's wages, salary, bonuses, and commissions for work that Mr. Baxi performed after March 31, 2010." Cmplt. at ¶ 73. Count III brought under either the Illinois Wage Payment and Collection Act, or in the alternative, under "India's labor law." *Id.* at 75. The Illinois Wage Protection and Collection Act, 820 ILCS 115/1 *et seq.*, requires employers to pay "final compensation" to former employees. 820 ILCS 115/5. The term "final compensation" is defined as compensation "owed by the employer pursuant to an employment contract or agreement between 2 parties," 820 ILCS 115/2. The Wage Act "does not confer any rights to recovery of final compensation in the absence of a contractual right." *Byker v. Sequent Computer Sys., Inc.*, 1997 WL 639045, at *7 (N.D. Ill. Oct. 1, 1997).

HEK contends that Plaintiff may not invoke the Wage Act because he is a resident of India and the Act protects only "employees in this State [Illinois]." 820 ILCS 115/1. HEK's contention fails at this stage of the case. The Wage Act does not have an "extraterritorial reach;" rather, its "evident purpose is to protect employees *in Illinois* from being stiffed by their employers." *Glass v. Kemper Corp.*, 133 F.3d 999, 1000 (7th Cir. 1998) (emphasis in original). However, "[t]he Wage Act protects an employee who performs work in Illinois for an Illinois employer, even if he resides in another state." *Adams v. Catrambone*, 359 F.3d 858, 863 (7th Cir. 2004); see also *Vendetti v. Compass Envt'l, Inc.*, 2006 WL 3694852, at *1 (N.D. Ill. Dec. 14, 2006) (Wage Act applies "where an employee has done at least some work for an Illinois

employer while physically present in the state of Illinois"); compare *Glass v. Kemper Corp.*, 133 F.3d at 1000 (Wage Act claim dismissed where plaintiff did not "perform any work in Illinois"); *Spaulding v. Abbott Laboratories*, 2010 WL 4822894, at *6 (N.D. Ill. Nov. 22, 2010) (Feinerman, J.). In his response brief, Plaintiff argues that the "overwhelming majority of the work Baxi did for EK in his many years of employment was in Illinois." Pl. Resp. at 10. Further, "[e]ven after relocating to India, Baxi was expected to, and in fact did, return to Illinois on several occasions to perform work for EK."[8] *Id.* If the facts adduced in discovery indisputably show that Plaintiff did not perform sufficient work in Illinois to warrant coverage under the Wage Act, HEK may raise this argument on summary judgment.

HEK further argues that "all of the work for which Baxi seeks compensation was performed in India, not in Illinois," since that work involved the winding down of the Mumbai office. This argument may ultimately prove successful on a motion for judgment on the pleadings or at summary judgment. See *Chen v. Quark Biotech, Inc.*, 2004 WL 1368797, at *6 (N.D. Ill. June 17, 2004) (granting summary judgment for defendant on Wage Act claim when "[t]he unpaid wages that plaintiff seeks as damages are for work that would have been performed in Ohio in 2002 and thereafter"). However, it is not readily clear from *Adams*, *Glass*, and the other cases cited by the parties whether, to be covered by the Act, it is enough that the plaintiff "performs [some] work in Illinois for an Illinois employer," *Adams*, 359 F.3d at 863, or whether the unpaid portion of the work must have been performed in Illinois. The Court is unwilling to dismiss Plaintiff's Wage Act claim on this ground without further briefing from the parties.

Plaintiff may also maintain a claim under "Indian labor law," despite the fact that

---

[8] While these "return trips" allegations are not present in the complaint, they are "consistent with the allegations" in the complaint, and are therefore properly considered on a motion to dismiss. *Evans v. U.S. Postal Service*, 428 F. Supp. 2d 802, 805 (N.D. Ill. 2006) (quoting *Dausch v. Ryske*, 52 F.3d 1425, 1428 n.3 (7th Cir. 1994)).

Plaintiff has not identified which aspect of that body of law governs its claim. "A complaint need not plead legal theories * * * [t]he defendant can elicit them by contention interrogatories." *Joseph v. Elan Motorsports Technologies Racing Corp.*, 638 F.3d 555, 561 (7th Cir. 2011) (citations omitted); see also *Brill v. Central States*, 1985 WL 1448, at *3 (N.D. Ill. May 22, 1985) ("A plaintiff is not required to allege his legal theory of recovery in the complaint.").[9] Defendants are on notice of the factual predicates for Plaintiff's labor law claim. Cmplt. at ¶¶ 52-55; 72-74.

Finally, in opposition to Plaintiff's labor law and *quantum meruit* claims (discussed below), HEK argues that Plaintiff's "allegation that he received no compensation for work performed after March 31, 2010 is misleading and false." Def. Mem. at 14. HEK argues that Plaintiff received a "generous" severance package that "more than fairly compensated Baxi for the purported 250 hours of work he allegedly performed on behalf of Ennis Knupp subsequent to March 31, 2010." The Court cannot consider this argument on a motion to dismiss, as it contradicts the allegations of the complaint. See Cmplt. at ¶ 54 ("Mr. Baxi has performed over 250 hours of work for EK without getting any compensation whatsoever."). Whether the severance package that Plaintiff received fairly compensated Plaintiff for work that he did following his termination is an issue that may be raised at summary judgment or at trial.

## H. Promissory Estoppel (Count X) and *Quantum Meruit* (Count XI)

Count X (promissory estoppel) is for the breach of Ennis Knupp's "clear and unambiguous promise to Mr. Baxi that he would be employed by EK until at least November 30, 2010." Cmplt. at ¶ 115. The only basis on which HEK challenges Count X is on the grounds that a promissory estoppel claim is not available when a contract governs the relationship out of

---

[9] No party has (as of yet) raised the question of whether this Court is the appropriate forum to adjudicate an alleged violation of Indian labor law.

which the promise allegedly emerged, and Plaintiff had alleged that an express oral contract was the source of the promise of continued employment. Def. Mem. at 23 (citing *Song*, 640 F. Supp. 2d at 1015). Above, the Court concluded that Plaintiff had not properly alleged the existence of the alleged oral contract. Accordingly, there is no contradiction between Plaintiff's breach of contract and promissory estoppel claims.[10]

In Count XI, (*quantum meruit*), Plaintiff alleges that he "performed extensive high-quality services for EK" for which he was not compensated. Cmplt. at ¶¶ 120-124. "A party seeking recovery on a quantum meruit theory must demonstrate the performance of services by the party, the conferral of the benefit of those services on the party from whom recovery is sought, and the unjustness of the latter party's retention of the benefit in the absence of any compensation." *Song*, 640 F. Supp. 2d at 1016. Plaintiff has alleged that he was not paid for the more than 250 hours of work that he performed in winding down Ennis Knupp's Mumbai office. *Id.* at ¶ 54. Further, Plaintiff alleges that he was not paid for other "services" that he performed through September 30, 2010. *Id.* Plaintiff alleges that "EK needed Mr. Baxi to keep working for the company in order to comply with Indian laws regarding the winding up of the Mumbai office." *Id.* at ¶ 55. Plaintiff has adequately alleged a claim for *quantum meruit*. Again, Defendant's only challenge to this Count is that a quasi-contractual theory of recovery cannot lie when an explicit contract governs the parties' relationship. The Court rejected this argument above.

## I.     Successor Liability

Plaintiff seeks to hold Defendants Hewitt Associates, Inc., also known as Aon Hewitt

---

[10] Even if the Court had not dismissed Plaintiff's breach of contract claim, the promissory estoppel claim would not be barred, as the liberal federal pleading rules allow plaintiffs to plead legal theories in the alternative. See *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999); Fed. R. Civ. P. 8(e)(2) (A party may state "as many separate claims or defenses as the party has regardless of consistency.").

("Hewitt"), and Aon Corporation ("Aon") liable for his injuries based upon the theory of successor liability. In their motion [31], Hewitt and Aon argue that the complaint fails to properly plead a basis for successor liability.

As discussed in detail above, the allegations of wrongdoing described in Plaintiff's complaint all relate to Plaintiff's employment by, ownership of stock in, and separation from Defendant Ennis Knupp. The complaint contains no allegations that Hewitt or Aon participated in any of the alleged acts that give rise to Plaintiff's causes of action. Instead, the allegations that relate to Hewitt and Aon are as follows:

15. Upon information and belief, Defendant Hewitt is the successor to EK after a merger that was completed on September 2, 2010.

16. Upon information and belief, Defendant Aon is the successor to EK and Hewitt after it acquired Hewitt in a merger that was completed on October 1, 2010.

17. Upon information and belief, Defendant Hewitt EnnisKnupp is a subsidiary of Aon and is also the successor to EK after a merger that was completed on September 2, 2010.

18. Upon information and belief, Defendant Aon Hewitt is a subsidiary of Aon and is also the successor to EK after a merger that was completed on October 1, 2010.

The complaint also contains a section titled "Successor Liability," which the Court will set forth in full below:

Successor Liability

24. EK was an independent firm that provided investment consulting services to institutional clients. On July 20, 2010, Hewitt, a global human resources consulting and outsourcing company, announced that it had entered into a definitive agreement to acquire EK.

25. On September 2, 2010, Hewitt announced that it had completed its acquisition of EK. The new entity, named Hewitt EnnisKnupp, is one of the largest providers of investment consulting services in the world, with $3 trillion in assets under advisement globally.

26. On October 1, 2010, Aon acquired Hewitt.

27. Upon information and belief, Hewitt EnnisKnupp is a wholly owned subsidiary of Aon.

28. Hewitt purchased all of EK's assets in an actual or de facto merger.

29. Aon purchased all of Hewitt's assets in an actual or de facto merger.

30. Hewitt is the successor to EK

31. Hewitt EnnisKnupp is the successor to EK.

32. Aon is the successor to EK.

33. Aon Hewitt is the successor to EK.

"Illinois common law states that a successor entity does not assume the liability of its predecessor." *Moriarty v. Svec*, 164 F.3d 323, 327 (7th Cir. 1998) (citing *Vernon v. Schuster*, 688 N.E.2d 1172, 1175 (Ill. 1999) ("a corporation that purchases the assets of another corporation is not liable for the debts or liabilities of the transferor corporation"); see also *Goldstein v. Gardner*, 444 F. Supp. 581, 583 (N.D. Ill. 1978). However, to prevent fraud or fundamental unfairness to creditors, Illinois's general rule against successor liability contains four exceptions: "(1) Where there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation; (3) where the purchaser is merely a continuation of the seller; or (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligation." *Vernon*, 688 N.E.2d at 1175.

With regard to the second exception, Illinois courts recognize that unlike asset purchases, "the universal rule applicable to mergers or consolidations is that, by operation of law, the successor corporation assumes all debts and liabilities of the predecessor corporation precisely as if it had incurred those liabilities itself." *Krull v. Celotex Corp.*, 611 F. Supp. 146, 148 (N.D. Ill. 1985). There are two types of mergers: *de jure* (or actual) mergers and *de facto* mergers. "The test for a de facto merger under Illinois law is satisfied when all four of the following conditions

are met: (1) there is a continuity of the business enterprise between seller and buyer, including continuity of management, employees, location, and assets; (2) there is a continuity of shareholders, in that shareholders of the seller become shareholders of the buyer; (3) the seller ceases operations and dissolves as soon as possible after the transaction; and (4) the buyer assumes those liabilities and obligations necessary for the uninterrupted continuation of the seller's business." *Reavley v. Toyota Motor Sales US Corp.*, 2001 WL 127662, at *3 (N.D. Ill. Feb. 14, 2001) (citations omitted). "Illinois courts have held that the most important factor in determining whether *de facto* or *de jure* merger has occurred is the identity of the ownership of the new and former corporations." *Diguilio v. Goss Intern. Corp*., 906 N.E.2d 1268, 1277 (Ill. App. Ct. 1st Dist. 2009); see also *Nilsson v. Continental Mach. Mfg. Co.*, 621 N.E.2d 1032, 1035 (Ill. App. Ct. 2d Dist. 1993) (same). [11]

As a preliminary matter, it is unclear *why* Plaintiff is seeking to sue any entity other than Ennis Knupp. Ennis Knupp does not appear to be defunct; rather it is a named Defendant that has retained its own counsel and filed an appearance in this lawsuit. As Aon and Hewitt note in their reply, the very purpose of successor liability is to prevent a party from avoiding its liabilities by transferring its assets to another entity and then dissolving. If Ennis Knupp is fully

---

[11] Plaintiff cites *EEOC v. G-K-G, Inc.*, 39 F.3d 740 (7th Cir. 1994), for the proposition that "when a violation of federal rights is involved, the Illinois rule does not apply and there is a much simpler two-part test for successor liability." Pl. Mem. at 21. See *G-K-G, Inc.*, 39 F.3d at 747-48 ("when a claim arising from a violation of federal rights is involved, the courts allow the plaintiff to go against the purchaser of the violator's business even if it is a true sale and not a reorganization, provided that two conditions are satisfied. The first is that the successor had notice of the claim before the acquisition. * * * The second condition is that there be substantial continuity in the operation of the business before and after the sale, and is satisfied if no major changes are made in that operation."). The two-part test is inapplicable here. For one, the Court has dismissed Plaintiff's only claim that alleged a violation of "federal rights"—the securities fraud claim. In any event, the Seventh Circuit has described the two-part test discussed in *G-K-G, Inc.* as "expand[ing] the common law rule for the sake of beneficiaries of federal statutes relating mainly to labor, including pensioners." *Feinberg v. RM Acquisition, LLC*, 629 F.3d 671, 674 (7th Cir. 2011). Plaintiff cites no decisions that have extended the rule to plaintiffs alleging securities fraud, and offers no other rationale as to why such an extension would be warranted.

extant and capitalized, presumably it could satisfy any liabilities assessed against it. See *Joseph Huber Brewing Co., Inc. v. Pamado, Inc.*, 2006 WL 2583719, at *14 (N.D. Ill. Sept. 5, 2006) (citing *Commercial Nat. Bank v. Newtson*, 349 N.E. 2d 138, 140 (Ill. App. Ct. 1st Dist. 1976) ("When the selling company continues to exist as a business entity after the sale, court are more likely to conclude that the purchasing company is not merely the continuation of the selling company.")); *Gray v. Munelein College*, 695 N.E.2d 1379, 1388-89 (Ill. App. Ct. 1st Dist. 1988) (no successor liability where transferor company "did not dissolve"). Regardless, it is not perfectly clear from the complaint what Ennis Knupp's current legal and/or financial status is. Further, the fact that the selling company continues to exist does not necessarily preclude a finding of successor liability. *Pamado, Inc.*, 2006 WL 2583719, at *14. So the Court will proceed with its analysis.

A few additional preliminaries: The third and fourth exceptions to the bar of successor liability are not in play here. Plaintiff does not argue that Hewitt and Aon are mere continuations of Ennis Knupp,[12] nor does Plaintiff allege that Ennis Knupp was sold for the fraudulent purpose of avoiding its obligations. *Vernon*, 688 N.E.2d at 1175. Further, contrary to Plaintiff's arguments, Aon and Hewitt have not "conceded" that they are successors to Ennis Knupp by the way in which they refer to themselves in their legal filings or in their marketing. The trade name for Hewitt Associates, Inc. is "Aon Hewitt." Plaintiff cites no support for the proposition that by merely using the word "Aon" in its trade name, Hewitt Associates, Inc. becomes an "alter ego" of the Aon Corporation. See Pl. Mem. at 22. Similarly, HEK has not "conceded" that it is the successor to Defendant Ennis Knupp & Associates simply because HEK states that it is "formerly known as" Ennis Knupp & Associates. See Pl. Mem. at 23.

---

[12] The test for continuation under Illinois law is whether the change in ownership is "a mere change in form without a significant change in substance." *Vernon*, 688 N.E.2d at 1176.

Much of Plaintiff's response is focused on the second exception, which relates to a consolidation or merger of the purchaser or seller corporation. The Court agrees with Hewitt and Aon that Plaintiff has not properly alleged that the transactions between Ennis Knupp and Hewitt and Hewitt and Aon were *de facto* mergers. For example, Plaintiff pleads no facts to suggest that Ennis Knupp & Associates "cease[d] operations and dissolves as soon as possible after the transaction," *Reavley*, 2001 WL 127662, at *3, or that there is a continuity of the business enterprise between Ennis Knupp and Hewitt. *Id.*

However, Plaintiff's complaint does allege that Hewitt acquired Ennis Knupp in an "actual" merger, and that Aon acquired Hewitt in an "actual" merger. To add further plausibility to its allegations that Ennis Knupp underwent a *de jure* merger with Hewitt and Hewitt merged with Aon, Plaintiff attaches two SEC filings to its response brief (one from Hewitt and one from Aon) that characterize the transactions both as "mergers" and as "acquisitions."[13] See, *e.g.* Hewitt Associates Form S-4, dated 9/2/2010 ("On July 12, Hewitt announced it had entered into a definiative agreement to merge with Aon Corporation."). This case is therefore distinguishable from *Ghouth v. Conticommodity Services, Inc.*, 642 F. Supp. 1325, 1329-30 (N.D. Ill. 1986) (cited by Hewitt and Aon), where Judge Aspen concluded that the "complaint fail[ed] to adequately allege" successor-in-interest status, where the *only* allegation pled was that one company had "purchased some of [the other's] assets."

As noted above, the most important factor in determining whether *de facto* or *de jure* merger has occurred is the identity of the ownership of the new and former corporations, *Diguilio*, 906 N.E.2d at 1277, and a proper assessment of that issue requires an examination of the "form" and "substance" of the legal arrangements among the parties in the transactions.

---

[13] The Court need not take judicial notice of these SEC filings in order to properly consider them. See *Evans v. U.S. Postal Service*, 428 F. Supp. 2d 802 (discussed *supra* n.8).

*Chicago Dist. Council of Carpenters Pension Fund v. G&A Installations, Inc.*, 1996 WL 66098, at *3 (N.D. Ill. Feb. 8, 1996); see also *Sterling Federal Bank, FSB v. Credit Suisse First Boston Corp.*, 2008 WL 4924926, at *13 (N.D. Ill. Nov. 14, 2008) (quoting *Pollack v. Laidlaw*, 1995 WL 261518, at *19 (S.D.N.Y. May 3, 1995) ("determination of successor liability* * * depends at least in part on the content of the agreements subject to discovery * * * * ").  Having alleged that the transactions among the Defendants were actual mergers, Plaintiff is entitled to discover whether, under the applicable documents, there indeed was a continuity of ownership between the shareholders.  Further, Plaintiff is entitled to discover whether there is "an express or implied agreement of assumption" between Ennis Knupp and Hewitt, and Hewitt and Aon, which Plaintiff could not know absent discovery.

As discussed above, the most important factor to consider in determining whether a merger has occurred is continuity of ownership between the transferor and transferee corporations.  The focus is on "whether the purchaser continues the *corporate entity* of the seller, not so much on whether the purchaser continues the *business operations* of the seller."  *North Shore Gas Co. v. Salomon Inc.,* 152 F.3d 642, 654 (7th Cir. 1998) (emphases in original).  In making this assessment, Illinois courts emphasize "the identity of the officers, directors, and stock between the selling and purchasing corporations."  *Diguilio*, 906 N.E.2d at 1062 (citing *Vernon*, 688 N.E.2d at 1176 ("In accord with the majority view, our appellate court has consistently required identity of ownership before imposing successor liability under the continuation exception.").  In the complaint, Plaintiff alleges that "upon consummation of the merger" between Ennis Knupp and Hewitt, he was "entitled to approximately $1.5 million, which constituted the fair market value of his shares."  Cmplt. at ¶ 4.  Hewitt and Aon argue that the fact that Plaintiff alleged that he should have received cash upon consummation of the Hewitt

acquisition (and not stock in Hewitt) suggests that there is no continuity of ownership. Hewitt/Aon Mem. at 8 (citing *Ruiz v. Blentech Corp.*, 89 F.3d 320, 325 (7th Cir. 1996) (affirming summary judgment for failure to prove successor liability, reasoning, in part, that there was no de facto merger because the owners of predecessor entity "received cash, not stock" from the purchasing entity)). Plaintiff's allegation seems to be directed more to the value that he would have received through the merger; it is not an allegation about the legal form of the merger. Like most of the cases cited in Hewitt and Aon's memorandum, *Ruiz* did not involve a case decided at the motion to dismiss stage. *Ruiz*, 89 F.3d at 322. Plaintiff is entitled to discovery to ascertain, among other things, precisely how the transactions among the Defendants were structured and effectuated. If discovery about the relationship among Ennis Knupp, Hewitt, and Aon reveals no basis for successor liability, Hewitt and Aon can quickly make their exit from this case at the summary judgment stage.

## IV.   Conclusion

For the reasons stated above, Defendant Hewitt Ennisknupp, Inc.'s motion to dismiss [24] is granted in part and denied in part. Counts I, II, IV, V, VI, VII, VIII, and IX are dismissed without prejudice. Plaintiff is given 28 days from the date of this Order in which to file an amended complaint, if he believes that he can cure the deficiencies discussed above. The motion to dismiss filed by Aon and Hewitt [31] is respectfully denied.

Dated:  September 2, 2011                  _____
                                           Robert M. Dow, Jr.
                                           United States District Judge