UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| NEERAJ BAXI,<br><br>                    Plaintiff,<br>          vs.<br><br>ENNIS KNUPP & ASSOCIATES, INC.; HEWITT ASSOCIATES, INC.; AON CORPORATION; AON HEWITT; and HEWITT ENNISKNUPP,<br><br>                    Defendants. | Case No.:  10-cv-6346<br><br>**Judge Robert M. Dow, Jr.**<br><br>**FIRST AMENDED COMPLAINT AND JURY DEMAND** |

For his First Amended Complaint[1] against Defendants Ennis Knupp & Associates, Inc. ("EK"), Hewitt Associates, Inc. ("Hewitt"), Aon Corporation ("Aon"), Aon Hewitt, and Hewitt EnnisKnupp (collectively, the "Defendants"), Plaintiff Neeraj Baxi, states and alleges through his attorneys as follows:

### PRELIMINARY STATEMENT

1.   In January 2010, Neeraj Baxi owned approximately 4% of EK, an investment consulting company with approximately $2 trillion in assets under consultation.  Mr. Baxi was a highly regarded principal at EK.  In January 2008, Mr. Baxi was going to pursue another professional opportunity but he was induced to stay at EK by being offered the opportunity to open EK's first foreign office, in Mumbai, India.

2.   In December 2009, the board of directors of EK and Mr. Baxi entered into an oral contract wherein Mr. Baxi's scope of work in India was expanded and, in return, Mr. Baxi was guaranteed employment until, at the very least, November 2010.

---

[1] For the convenience of the Court and opposing parties, attached as Exhibit A is a redline document comparing the original Complaint with the First Amended Complaint.

3.    However, on February 1, 2010, EK reneged on its promise to Mr. Baxi and, without any advance notice, it asked him to resign.  This 180 degree shift was not an accident.  It was a sly maneuver that was designed to induce Mr. Baxi to sell his shares for less than a tenth of their value shortly before the consummation of a merger between EK and Hewitt.

4.    Mr. Baxi's 4% ownership stake consisted of 1196 shares, which were governed by a stock restriction and purchase agreement (the "SPA").  According to the SPA, in the event that EK was sold, Baxi was entitled his *pro rata* share of the purchase price.  There were other provisions of the SPA that controlled the sale price of shares 90 days after a lawful termination. But in the event that two-thirds of EK's shareholders elected to sell the company, each shareholder at the time of the vote would be entitled to their *pro rata* share of the purchase price.

5.    The merger between EK and Hewitt was consummated on or before July 2, 2010, at which time Mr. Baxi was entitled to approximately $1.5 million, which would have been his *pro rata* share of the purchase price of EK.

6.    Instead, a few months earlier, on February 2, 2010, EK induced Mr. Baxi to sell his shares back to the company for just $119,600 by, among other things, making the following misrepresentations and omissions:  (i) Mr. Baxi was told that there was no concrete reason for the company reneging on its promise to keep the Indian office open until at least November 2010; (ii) Mr. Baxi was told that "due to commercial reasons [EK] intend[s] to liquidate" the Indian office;  (iii) Mr. Baxi was told that the fair market value for his shares was just $119,600; (iv) Mr. Baxi was not told that there were any plans for any significant changes to EK's operations or ownership; (v) Mr. Baxi was not told that EK was in the midst of merger talks with Hewitt; and (vi) Mr. Baxi was not told that if he continued to work at the company for just a few more months, instead of getting $119,600 for his shares, he would be entitled to approximately

$1.5 million.

7.  EK induced Mr. Baxi into resigning and then immediately exercised its option to purchase his shares in the company for a fraction of their true value.  This brazen deception cost Mr. Baxi over $1 million and constituted a violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b-5, 17 C.F.R. § 240.10b-5.

8.  This opportunistic misconduct also constituted common law fraud (or negligent misrepresentation), breach of fiduciary duty, and breach of contract.  Mr. Baxi is entitled to rescind the sale of his shares, which was done under false pretenses.

9.  Remarkably, even after he resigned and EK bought his shares, EK exploited the personal relationship between Mr. Baxi and its board members to keep him working for the company.  Instead of severing ties with Mr. Baxi on February 2, 2009, EK informed Mr. Baxi that it "anticipate[d] a period where we would seek your assistance to close out events for EK India."  That period did not expire on February 2 – the day that Mr. Baxi was induced to sell his shares back to the company.  Instead, EK kept Mr. Baxi on its payroll until March 31, 2010.

10. In another cynical display of opportunistic misconduct, March 31 was not selected as the last day to have Mr. Baxi on payroll because it marked the last day that Mr. Baxi was expected to work for EK.   Rather, March 31 was an opportunistic termination date.  The agreements governing EK's grants of stock to Mr. Baxi provided that Mr. Baxi had 90 days after termination to sell his shares back to EK.  March 31 was likely chosen as the last day Mr. Baxi would be on payroll because it was 92 days before July 2, 2010, the day that EK sold itself to Hewitt.

11. Defendants opportunistically took Mr. Baxi off payroll on March 31 in order to avail themselves of the argument that Mr. Baxi was obligated to sell back his shares prior to the

transaction between EK and Hewitt. But this argument is unavailing because (i) opportunistic misconduct is barred by the covenant of good faith and fair dealing present in every contract; (ii) according to the SPA, Mr. Baxi's right to his *pro rata* share of EK's purchase price vested when at least two-thirds of EK's shareholders elected to consummate the sale of the company, which, upon information and belief, happened at least two days before July 2, 2010; (iii) Mr. Baxi was not actually terminated until sometime on or after September 10, 2010; and (iv) an Oral Contract barred Defendants from terminating Mr. Baxi until the end of November 2010, without his consent.

12. While EK's payments ceased on March 31, 2010, the company needed Mr. Baxi to keep working for it so that it could comply with Indian laws regarding the winding down of the Indian office. Thus, since March 31, Mr. Baxi performed over 250 hours of work for EK without getting any compensation whatsoever. Indeed, until September 10, 2010 Mr. Baxi was still being asked to perform services for the company and, as of September 30, 2010, he was still listed on EK's website as a member of the "General Consulting Team." This is a violation of the Defendants' contractual obligations and the labor laws of Illinois and India.

13. In a revealing twist, on July 20, 2010, just 18 days after the Hewitt-EK purchase agreement was signed, Defendants exhibited consciousness of their guilt. On that day, EK asked Mr. Baxi for a release of all potential claims against the Defendants. EK offered to make a "special payment" of $200,000 in exchange for the release. But, on July 20, Mr. Baxi did not yet realize he had been duped. He had not threatened litigation, issued a demand letter, or even retained a lawyer. Thus, EK's solicitation of a release was not a settlement offer, it was just another attempt to deceive Mr. Baxi. This time, Mr. Baxi was not tricked. He rejected the "special payment" and resolved to seek the "full payment" to which he was entitled.

4

14. Accordingly, Mr. Baxi is entitled to compensatory, statutory, and punitive damages, as well as attorneys' fees, for the Defendants' violations.

**PARTIES**

15. Plaintiff Baxi is a resident of India.

16. Upon information and belief, Defendant EK is an Illinois corporation with its headquarters and principal place of business in Chicago, IL.

17. Upon information and belief, Defendant Hewitt is a Delaware corporation with its headquarters and principal place of business in Lincolnshire, IL.

18. Upon information and belief, Defendant Aon Corporation is a Delaware corporation with its headquarters and principal place of business in Chicago, IL.

19. Upon information and belief, Defendant Hewitt EnnisKnupp is a corporation with its headquarters and principal place of business in Chicago, IL.

20. Upon information and belief, Defendant Aon Hewitt is a corporation with its headquarters and principal place of business in Lincolnshire, IL.

21. Upon information and belief, Defendant Hewitt is the successor to EK after a merger that was completed on September 2, 2010.

22. Upon information and belief, Defendant Aon is the successor to EK and Hewitt after it acquired Hewitt in a merger that was completed on October 1, 2010.

23. Upon information and belief, Defendant Hewitt EnnisKnupp is a subsidiary of Aon and is also the successor to EK after a merger that was completed on September 2, 2010.

24. Upon information and belief, Defendant Aon Hewitt is a subsidiary of Aon and is also the successor to EK after a merger that was completed on October 1, 2010.

## JURISDICTION AND VENUE

25. This is an action for securities fraud under federal law in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b-5, 17 C.F.R. § 240.10b-5, and state law claims for fraud, breach of fiduciary duty, negligent representation, unjust enrichment and rescission.

26. This Court has jurisdiction over the subject matter of these claims pursuant to 28 U.S.C. § 1331 and under principles of supplemental jurisdiction, 28 U.S.C. §1367(a).

27. In addition, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), in that Plaintiff is a citizen of a foreign state and Defendants are citizens of the states of Delaware and Illinois and the matter in controversy exceeds $75,000, exclusive of interest and costs.

28. Upon information and belief, this Court has personal jurisdiction over Defendants because they reside in Chicago and they conduct substantial business in the State of Illinois.

29. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

**Successor Liability**

30. EK was an independent firm that provided investment consulting services to institutional clients.  On July 20, 2010, Hewitt, a global human resources consulting and outsourcing company, announced that it had entered into a definitive agreement to acquire EK.

31. On September 2, 2010, Hewitt announced that it had completed its acquisition of EK. The new entity, named Hewitt EnnisKnupp, is one of the largest providers of investment consulting services in the world, with $3 trillion in assets under advisement globally.

32. On October 1, 2010, Aon acquired Hewitt.

6

33. Upon information and belief, Hewitt EnnisKnupp is a wholly owned subsidiary of Aon.

34. Hewitt purchased all of EK's assets in an actual or de facto merger.

35. Aon purchased all of Hewitt's assets in an actual or de facto merger.

36. Hewitt is the successor to EK

37. Hewitt EnnisKnupp is the successor to EK.

38. Aon is the successor to EK.

39. Aon Hewitt is the successor to EK.

**The Hewitt EK Merger Negotiations**

40. EK and Hewitt were engaged in negotiations for the sale of EK prior to February 1, 2010, the date that EK asked Mr. Baxi to resign and to sell his shares in the company.

41. Mr. Baxi's sale of his EK shares constituted the sale of a security under § 10(b) and Rule 10b-5. At the time EK purchased its stock from Mr. Baxi, it was a closed corporation that had a special obligation to disclose all material facts to Mr. Baxi. Material facts include those that affect the probable future of the company and may affect the desire of investors to buy, sell, or hold the company's securities. EK's negotiations about a merger with Hewitt were clearly material since they affected (i) the value of EK's shares; and (ii) the likelihood that EK's shareholders would be able to cash out their shares in the near future.

42. Nonetheless, when EK was negotiating with Mr. Baxi about his resignation package, it did not inform him of material facts that would have affected Mr. Baxi's decision to resign and/or sell his shares back to the company.

43. At the time of the purchase of Mr. Baxi's shares, there was a relationship of trust and confidence between EK's insiders and Mr. Baxi. EK's directors and majority shareholders had a

fiduciary duty to disclose the Hewitt merger negotiations to Mr. Baxi when they were pressing him to resign and sell back his shares.

44. The merger agreement between Hewitt and EK was signed on Saturday, July 2, 2010. EK's shareholders had to vote to consummate the merger sometime prior to the day the merger agreement was signed. Upon information and belief, EK's shareholders elected to consummate the merger more than two days before the merger agreement was signed. Consequently, even if Mr. Baxi was lawfully terminated on March 31, 2010, if he had not been deceived, he would have been a shareholder at the time that the merger vote was taken, which took place less than 90 days after he was supposedly terminated.

**Mr. Baxi's Employment With EK**

45. Mr. Baxi joined EK as senior investment analyst in July 2000. Mr. Baxi advised clients about their investment policies, asset allocations, investment structures, manager evaluations, and performance reports. He also developed and maintained client relationships and was the lead/co-lead consultant for several clients with investment programs ranging from $60 million to over $200 billion.

46. Mr. Baxi excelled at his job and over time he was repeatedly given more responsibility and promoted. In 2002, Mr. Baxi was promoted to Associate, and as part of the promotion, was required to purchase 100 shares of EK for $10,000. As an Associate, Mr. Baxi became a co-owner of EK. After years of hard work, in 2005, Mr. Baxi was further promoted to the role of Principal. He was required to subscribe to an additional 900 shares of EK stock for $90,000. In 2006, Mr. Baxi was awarded 196 more shares so that he could "participate in the economic growth of the company." Ultimately, Mr. Baxi owned approximately 4% of EK. Consequently, he owed and was owed a fiduciary duty to and by his fellow owners.

47. As a principal, Mr. Baxi continued to perform at a very high level. In 2008, he was going to leave EK to pursue another opportunity in India. But when Mr. Baxi informed EK of his intention to leave the company, the board of directors asked him to stay. In fact, they asked him to take on a significant new responsibility: Move to India to open EK's first foreign office.

48. EK promised Mr. Baxi that it would give him the time and resources he needed to get the Indian office off the ground. In reliance on EK's representations, Mr. Baxi moved to India in March 2008. In April 2009, EK and Mr. Baxi executed an employment contract which stated that Mr. Baxi could only be terminated in accordance with Indian law (the "Employment Agreement"). A true and correct copy of the Employment Agreement is attached hereto as Exhibit B.

49. Paragraph 2 of the Employment Agreement stated that scope of Mr. Baxi's work as the head of the Indian office was to "[1] be responsible for identifying suitable third parties to enable the Company to outsource certain of its functions, [2] provide suitable oversight and supervision for the same and [3] undertake research relevant to the Company's clients investment programs."

50. In other words, when Mr. Baxi signed the Employment Agreement, he only agreed to do back-office work for EK. None of the tasks Mr. Baxi promised to perform pursuant in the Employment Agreement were client-facing. To the contrary, Mr. Baxi's job was to outsource to India some of the administrative tasks that were previously being performed in Illinois and to conduct research.

**The Oral Contract**

51. In mid-2009, EK started speaking to Mr. Baxi about expanding the scope of his work to include actively selling consulting services to foreign clients. To that end, Mr. Baxi came up with a potential business plan that he could implement if he was given enough time and support.

52. On December 4, 2009, Steve Voss, a member of the management team and board of directors of EK, contacted Mr. Baxi to discuss the progress of the Indian office.

53. Mr. Voss told Mr. Baxi that EK wanted to change the strategic direction of the Indian office. Instead of having Mr. Baxi focus 100% of his efforts on administrative tasks that supported the Illinois office (as delineated in the Employment Agreement), EK wanted Mr. Baxi to undertake client-facing activities. Specifically, EK wanted Mr. Baxi to start selling consulting services to foreign clients. This was a totally different job than the one that Mr. Baxi accepted when he signed the Employment Agreement.

54. Mr. Voss offered Mr. Baxi the following agreement: If Mr. Baxi accepted the challenge of generating new client business out of the Indian office and committed to sticking with the Indian office until November 2010, EK would continue to employ Mr. Baxi and the Indian office would remain open until, at the very least, November 2010.

55. Mr. Baxi accepted the offer. He relied on EK's representations and made reciprocal commitments to EK. In consideration for EK's promise to employ him until at least November 2010, Mr. Baxi committed: (i) to use his best efforts to generate at least $260,000 in revenue for EK in 2010 and $790,000 in revenue in 2011; (ii) to not leave the Indian office until the end of November 2010; and (iii) not exercise his right to reject the modification to the Employment Agreement.

56. Thus, the December 4, 2009 oral contract (the "Oral Contract") modified three terms of the Employment Agreement.

57. First, the Oral Contract modified the scope of work in the Employment Agreement. Instead of only providing administrative support for the Illinois office, Mr. Baxi agreed to solicit and service direct consulting assignments for third-party clients in Asia, the Middle East, and North Africa in order to try to generate at least $260,000 in revenue for EK in 2010 and $790,000 in revenue in 2011.

58. Second, the Oral Contract modified Paragraph 7 of the Employment Agreement in favor of EK. Instead of insisting on his right to terminate the Employment Agreement on one month's written notice, Mr. Baxi committed to staying with EK's Indian office until the end of November 2010, at the very least.

59. Third, the Oral Contract modified Paragraph 7 of the Employment Agreement in favor of Mr. Baxi. Instead of insisting on its right to terminate the Employment Agreement on one month's written notice, EK committed to employing Mr. Baxi until the end of November 2010, at the very least.

60. None of the other terms of the Employment Agreement were modified by the Oral Contract.

61. Mr. Baxi relied on the representations made by EK in making the decision to not enforce his right to reject the modification of the Employment Agreement and to not look for another job.

62. After the Oral Contract was struck, Mr. Baxi immediately took steps to honor his end of the bargain. He started contacting potential clients in order to develop 5 to 6 retainer/project

relationships in 2010, with a revenue target of $260,000 in 2010, and a target of $790,000 in 2011.

63. Mr. Baxi was EK India's only employee, so this work could only be performed by him.

64. The fact that a business plan was created in 2009, which modified the scope of work contained in the Employment Agreement, is further evidence that the Oral Contract was binding on the parties.

65. In addition, on July 20, 2010, just 18 days after the Hewitt-EK purchase agreement was signed, EK sought a release of all potential claims against the Defendants. EK offered to make a "special payment" of $200,000 in exchange for the release. But on July 20, Mr. Baxi did not yet realize he had been duped. He had not threatened litigation, issued a demand letter, or even retained a lawyer. Thus, EK's solicitation of a release was not a settlement offer, it was just another attempt to deceive Mr. Baxi.

66. This "special payment" in exchange for a release is further evidence that the Oral Contract precluded Defendants from terminating Baxi's employment because the $200,000 offer would not have been made unless the Defendants knew that their termination of Mr. Baxi was improper. Mr. Baxi rejected this duplicitous offer.

**EK's Fraud**

67. Mr. Baxi relied on Mr. Voss's representation about his employment and assured Mr. Voss that he would stay until at least November 2010 so that he could fulfill his duties to the company.

68. However, less than two months later, on February 1, 2010, Mr. Voss called Mr. Baxi to renege on EK's earlier promise. Mr. Voss said that the Indian office was being shut down and Mr. Baxi was asked to resign immediately.

69. Mr. Baxi asked Mr. Voss why EK had changed strategy so suddenly and whether there was anything significant happening with the company. Mr. Baxi was told that there was no concrete reason for the company reneging on its promise to keep the Indian office open until at least November 2010. This was a misrepresentation. According to statements made by EK executives, at that time, EK was engaged in merger talks with Hewitt, and EK decided to shut down its Indian operations in order to become a more attractive acquisition target. If Mr. Baxi had been told that this was the reason that EK was trying to buy back his shares he would not have resigned or sold his shares to EK.

70. The next day, on February 2, 2010, Mr. Voss sent Mr. Baxi a purported termination letter stating that "due to commercial reasons [EK] intend[s] to liquidate" the Indian office. This was also a misrepresentation. Again, the purpose of shutting down the Indian office was to become a more attractive acquisition target to Hewitt and/or to deny Mr. Baxi his *pro rata* share of the purchase price.

71. Mr. Baxi was also told that the value of his shares was just $119,600. This was untrue. At the time of this conversation, EK had conducted valuations of its shares and it knew that in the event of a merger, Mr. Baxi's shares would be worth well over $1 million.

72. During this conversation, EK also concealed at least three material facts from Mr. Baxi. First, Mr. Baxi was not told that EK was in the midst of merger talks with Hewitt. Second, Mr. Baxi was not told that there were any plans for any significant changes to EK's operations or ownership. Third, Mr. Baxi was not told that if he continued to work at the

company for just a few more months, instead of getting $119,600 for his shares, he would be entitled to approximately $1.5 million.

73. These facts would have affected Mr. Baxi's decision to resign and/or sell his shares back to EK. Mr. Baxi would not have resigned and he would not have sold back his shares to EK until all of his work with the company was complete and he was terminated in accordance with his employment contract and Indian law.

74. After engaging in such cold-blooded deception, on February 2, 2010, Mr. Voss sent Mr. Baxi an email with a resignation letter attached. Mr. Voss asked Mr. Baxi to sign the resignation letter and then, immediately afterwards, to sign another agreement wherein Mr. Baxi would sell his 1196 shares of EK back to the company.

75. Not realizing that he was being duped, based on EK's representations and disclosures, Mr. Baxi agreed to resign and to sell his shares back to the company.

**EK Violates Labor Laws**

76. Rather than severing ties with Mr. Baxi on February 2, 2010, EK informed Mr. Baxi that it "anticipate[d] a period where we would seek your assistance to close out events for EK India." That period did not expire on February 2 – the day that Mr. Baxi sold his shares back to the company – or on February 5 – the day Mr. Baxi submitted his resignation letter. Instead, EK kept Mr. Baxi on its payroll until March 31, 2010.

77. March 31 was not selected as the last day that Mr. Baxi would be on payroll because it marked the last day that Mr. Baxi was expected or needed to work for EK. Rather, March 31 was an opportunistic termination date. The agreements governing EK's grants of stock to Mr. Baxi provided that Mr. Baxi had 90 days after termination to sell his shares back to EK. March 31 was 92 days before the purchase agreement with Hewitt was signed. The Defendants

14

opportunistically chose March 31 as the last day that Mr. Baxi would be on payroll in order to avail themselves of the argument that Mr. Baxi was obligated to sell back his shares prior to the transaction between Hewitt and EK. But Mr. Baxi was not actually terminated on March 31.

78. While EK's payments ceased on March 31, 2010, the company needed Mr. Baxi to keep working for it so that it could comply with Indian laws regarding the winding down of the Indian office.

79. Pursuant to various Indian regulations, including the Companies Act of 1956, in order to voluntarily wind down the Indian office, EK had to conduct many tasks including the following: (i) Preparation of notices to be sent to Income Tax Office, Sales Tax Office, Registrar of Companies, and other governmental authorities; (ii) Publication of notices of winding down in the Official Gazette; (iii) Preparation of board minutes authorizing the various actions necessary for winding down; (iv) Hiring an official liquidator; (v) Providing the official liquidator with books and records, including audited financial statements; (vi) Filing a Statement of Affairs with the proper governmental authorities; (vii) Submitting an affidavit attesting that the Statement of Affairs "contains a full and accurate account of the company's affairs"; and (viii) Signing the final auditor's report.

80. The Indian voluntary wind down process is very onerous and, even in simple cases, takes hundreds of hours to complete. But if EK did not comply with the regulations, it could have been difficult, if not impossible, for Defendants to ever do business in India again.

81. Consequently, EK needed or, at the very least, greatly benefitted from Mr. Baxi's assistance. He had first-hand knowledge of all of the information required in the various filings and publications mandated by Indian law. In addition, Mr. Baxi knew the people and companies that EK needed to hire to handle the administration of the wind down. Without Mr. Baxi's

assistance, EK would likely have run afoul of Indian regulations and other EK directors, who would have been required to sign affidavits without first-hand knowledge, could have committed perjury.

82. During the entire existence of the Indian office, Mr. Baxi was its sole employee. He handled all the finances of the company and was the only member of EK who had the necessary knowledge and information to review and substantiate the information required in the final auditor's report, the Statement of Affairs, and various other documents that had to be submitted to governmental authorities before the Indian office could wind down.

83. EK needed Mr. Baxi to provide information and assistance to the authorized agents who were preparing and filing the documents necessary for the wind down of the Indian office.

84. Indeed, consistent with EK's wind down obligations, Mr. Baxi was not actually terminated until September 10, 2010. Until September 10, 2010 Mr. Baxi was still being asked to perform services for the company and, as of September 30, 2010, he was still listed on EK's website as a member of the "General Consulting Team."

85. Mr. Baxi was asked to perform many critical tasks between March 31, and September 10, 2010. For example, on July 5, 2010, Mr. Baxi appointed Dipti Mehta as the Liquidator of the Indian office.

86. On July 14, 2010, as a deponent with first-hand knowledge of the affairs of the Indian office, Mr. Baxi signed an affidavit wherein he swore that the Statement of Affairs "contains a full and accurate account of the company's affairs." This affidavit was co-signed by Stephen Cummings, but Mr. Cummings could not have attested to the Indian office's state of affairs without relying on information provided to him by Mr. Baxi.

87. On June 18, 2010, Mr. Baxi signed: (i) the Indian office's March 2010 balance sheet; (ii) the March 2010 profit and loss statement; and (iii) the Schedule G Accounting Notes for the March 2010 Financial Statements. These financial statements were co-signed by Steven Voss, but Mr. Voss could not have attested to the Indian office's financials without relying on information provided to him by Mr. Baxi.

88. EK could not have terminated Mr. Baxi on February 2, without violating Mr. Baxi's contractual rights and Indian law. In other words, if Baxi had not resigned from EK in February 2010, EK would not have had a free hand to fire him. And since March 31, Mr. Baxi has performed over 250 hours of work for EK without getting any compensation whatsoever.

89. Any assertion that Defendants could have completed the wind down without Mr. Baxi's assistance is false and is belied by three important facts.

90. First, EK did not terminate its relationship with Mr. Baxi. If EK could have completed the wind down without Mr. Baxi's assistance, the company should have told him that his assistance was unnecessary.

91. Second, on September 10, 2010, when EK finally terminated its relationship with Mr. Baxi, David Testore, Hewitt EnnisKnupp's Chief Administrative Officer, asked Mr. Baxi to "Please deliver all records and documents of Ennis Knupp & Associates India Pvt Ltd in your possession to [the wind down agent]." In other words, in September 2010, Mr. Baxi still had records and documents that were necessary for the wind down of the Indian office. He had these records and documents precisely because he was using them to wind down the office.

92. Third, the July 20, 2010 offer to give Mr. Baxi a "special payment" of $200,000 demonstrated that the Defendants knew that Mr. Baxi should have been compensated for the critical services he was providing.

93. In short, EK needed Mr. Baxi to keep working for the company in order to comply with Indian laws regarding the winding up of the Mumbai office. But EK was desperate to buy Mr. Baxi's shares before the merger with Hewitt was consummated so that it could buy the shares for a fraction of the fair market price. Thus, EK engaged in fraud and committed labor law violations.

**FIRST CAUSE OF ACTION**
**(VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5)**

94. Plaintiff realleges all of the relevant paragraphs set forth above.

95. Prior to EK's purchase of Mr. Baxi's shares, EK carried out a scheme which was intended to and did: (i) deceive Mr. Baxi; and (ii) cause Mr. Baxi to sell his shares of EK earlier than he would have sold them if EK had not made misrepresentations and/or omissions of material facts.

96. On February 2, 2010, EK induced Mr. Baxi to sell his shares back to the company for just $119,600 by, among other things, making the following misrepresentations and omissions: (i) Mr. Baxi was told that there was no concrete reason for the company reneging on its promise to keep the Indian office open until at least November 2010; (ii) Mr. Baxi was told that "due to commercial reasons [EK] intend[s] to liquidate" the Indian office; (iii) Mr. Baxi was told that the fair market value for his shares was just $119,600; (iv) Mr. Baxi was not told that there were any plans for any significant changes to EK's operations or ownership; (v) Mr. Baxi was not told that EK was in the midst of merger talks with Hewitt; and (vi) Mr. Baxi was not told that if he continued to work at the company for just a few more months, instead of getting $119,600 for his shares, he would be entitled to approximately $1.5 million.

97. EK made these misrepresentations in order to induce Mr. Baxi into selling his shares for over $1 million less than they were actually worth.

98. EK had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. EK's misrepresentations and omissions were done knowingly or recklessly for the purpose of concealing EK's efforts to be acquired by Hewitt or some other entity.

99. Mr. Baxi, without knowledge of the falsity of the statements made by EK or of the material omissions contained therein, and believing such statements to be true and complete, and in reasonable and justifiable reliance upon the statements and representations made by EK, as previously set forth herein, sold his 1196 shares of EK to the company itself on February 2, 2010.

100. EK could not have forced Mr. Baxi to have sold his shares back to the company because: (i) as alleged above, including Paragraphs 51 to 66, Mr. Baxi had a contractual right to stay employed until the end of November 2010; and (ii) as alleged above, including Paragraphs 78 to 93, EK needed Mr. Baxi's assistance in winding down the Indian office.

101. Mr. Baxi would not have sold his shares of EK but for his reliance upon the statements and representations made by EK in connection with the sale of these securities.

102. As a direct and proximate result of EK's wrongful conduct, Mr. Baxi suffered damages and is entitled to judgment rescinding the fraudulent purchase of his EK shares, or alternatively, compensatory damages to be determined at trial.

103. As a result of EK's violation of Section 10(b) of the Exchange Act and Rule 10b-5, Mr. Baxi has been injured in an amount to be determined at trial but believed to be not less than $1.5 million.

## SECOND CAUSE OF ACTION
### (BREACH OF FIDUCIARY DUTY)

104. Plaintiff realleges all of the relevant paragraphs set forth above.

105. Mr. Baxi was a minority stakeholder in EK. The board of directors and the controlling shareholders of EK owed Mr. Baxi a fiduciary duty of trust and confidence.

106. Among other fiduciary duties, EK's insiders owed Mr. Baxi a duty to reveal all material information about the future of the company when they were negotiating Mr. Baxi's resignation package, which included the repurchase of EK's stock from Mr. Baxi.

107. However, EK's insiders violated their fiduciary duties by, among other things, making the following misrepresentations and omissions: (i) Mr. Baxi was told that there was no concrete reason for the company reneging on its promise to keep the Indian officeopen until at least November 2010; (ii) Mr. Baxi was told that "due to commercial reasons [EK] intend[s] to liquidate" the Indian office; (iii) Mr. Baxi was told that the fair market value for his shares was just $119,600; (iv) Mr. Baxi was not told that there were any plans for any significant changes to EK's operations or ownership; (v) Mr. Baxi was not told that EK was in the midst of merger talks with Hewitt; and (vi) Mr. Baxi was not told that if he continued to work at the company for just a few more months, instead of getting $119,600 for his shares, he would be entitled to approximately $1.5 million.

108. These breaches of fiduciary duty proximately caused Mr. Baxi's damages because: (i) as alleged above, including Paragraphs 51 to 66, Mr. Baxi had a contractual right to stay employed until the end of November 2010; and (ii) as alleged above, including Paragraphs 78 to 93, EK needed Mr. Baxi's assistance in winding down the Indian office.

109. Mr. Baxi would not have sold his shares of EK but for his reliance upon the statements and representations made by EK in connection with the sale of these securities.

20

110.    EK's insiders' breach of fiduciary duties was wanton and willful and was executed purposefully knowing that they would inflict financial harm to Mr. Baxi, who is entitled to compensatory and punitive damages.

## THIRD CAUSE OF ACTION
### (VIOLATION OF LABOR LAWS)

111.    Plaintiff realleges all of the relevant paragraphs set forth above.

112.    At all relevant times, Mr. Baxi was an employee of EK.

113.    EK unlawfully did not pay Mr. Baxi's wages, salary, bonuses, and commissions for work that Mr. Baxi performed after March 31, 2010.

114.    EK failed to pay Mr. Baxi's wages, salary, bonuses, and commissions biweekly and/or monthly, as required by law.

115.    Mr. Baxi is entitled to recover his unpaid wages, salary, bonuses, and commissions.

116.    Upon information and belief, Mr. Baxi's labor law claims are governed by the Illinois Wage Payment and Collection Act because EK is located in Illinois and a substantial portion of the work Mr. Baxi did for EK (even after opening the Indian office) was done in and with Illinois.  In the alternative, Mr. Baxi's labor law claims are governed by India's labor law.

117.    But for EK's violation of the applicable labor law, Mr. Baxi would have been paid the fair market value of his EK shares at the time he ceased working for EK, and Mr. Baxi is entitled to recover the difference between the fair market value of his shares at that time and the amount that he was actually paid.

118.    To the extent permitted by law, Mr. Baxi is entitled to attorneys' fees incurred in connection with his recovery of the unpaid wages, salary, bonuses, and commissions, as well as statutory and/or punitive damages.

21

**FOURTH CAUSE OF ACTION**
**(FRAUDULENT INDUCEMENT)**

119.    Plaintiff realleges all of the relevant paragraphs set forth above.

120.    Prior to EK's purchase of Mr. Baxi's shares, EK carried out a scheme which was intended to and did:  (i) deceive Mr. Baxi; and (ii) cause Mr. Baxi to sell his shares of EK earlier than he would have sold them if EK had not made misrepresentations and/or omissions of material facts.

121.    On February 2, 2010, EK induced Mr. Baxi to sell his shares back to the company for just $119,600 by, among other things, making the following misrepresentations and omissions:  (i) Mr. Baxi was told that there was no concrete reason for the company reneging on its promise to keep the Indian office open until at least November 2010; (ii) Mr. Baxi was told that "due to commercial reasons [EK] intend[s] to liquidate" the Indian office;  (iii) Mr. Baxi was told that the fair market value for his shares was just $119,600; (iv) Mr. Baxi was not told that there were any plans for any significant changes to EK's operations or ownership; (v) Mr. Baxi was not told that EK was in the midst of merger talks with Hewitt; and (vi) Mr. Baxi was not told that if he continued to work at the company for just a few more months, instead of getting $119,600 for his shares, he would be entitled to approximately $1.5 million.

122.    EK made these misrepresentations in order to induce Mr. Baxi into selling his shares for over $1 million less than they were actually worth.

123.    EK had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them.  EK's misrepresentations and omissions were done knowingly or recklessly for the purpose of concealing EK's efforts to be acquired by Hewitt or some other entity.

22

124. Mr. Baxi, without knowledge of the falsity of the statements made by EK or of the material omissions contained therein, and believing such statements to be true and complete, and in reasonable and justifiable reliance upon the statements and representations made by EK, as previously set forth herein, sold his 1196 shares of EK to the company itself on February 2, 2010.

125. EK could not have forced Mr. Baxi to have sold his shares back to the company because: (i) as alleged above, including Paragraphs 51 to 66, Mr. Baxi had a contractual right to stay employed until the end of November 2010; and (ii) as alleged above, including Paragraphs 78 to 93, EK needed Mr. Baxi's assistance in winding down the Indian office.

126. Mr. Baxi would not have sold his shares of EK but for his reliance upon the statements and representations made by EK in connection with the sale of these securities.

127. As a direct and proximate result of EK's wrongful conduct, Mr. Baxi suffered damages and is entitled to judgment rescinding the fraudulent purchase of his EK shares, or alternatively, compensatory damages to be determined at trial.

128. As a result of EK's fraud, Mr. Baxi has been injured in an amount to be determined at trial but believed to be not less than $1.5 million.

## FIFTH CAUSE OF ACTION
### (NEGLIGENT MISREPRESENTATION)

129. Plaintiff realleges all of the relevant paragraphs set forth above.

130. EK's insiders had special knowledge and expertise regarding the value of its shares and the likelihood of a merger being consummated, by virtue of being privy to merger negotiations with Hewitt and/or other entities.

131. During the course of his conversations and emails with Mr. Baxi on February 1 and February 2, 2010, Steve Voss made representations that were calculated to induce Mr. Baxi

23

to sell his shares.

132.    These representations were intentionally false or negligently made.

133.    Mr. Voss knew that Mr. Baxi would rely on those representations.

134.    Mr. Baxi was entitled to rely on Mr. Voss's representations because Mr. Voss was an insider at EK who owed Mr. Baxi fiduciary duties of trust and confidence.

135.    The natural and probable consequences of EK's misrepresentations were, among other things: (i) Mr. Baxi's decision to sell his shares to EK; and (ii) Mr. Baxi's decision to resign.

136.    EK could not have forced Mr. Baxi to have sold his shares back to the company because:  (i) as alleged above, including Paragraphs 51 to 66, Mr. Baxi had a contractual right to stay employed until the end of November 2010; and (ii) as alleged above, including Paragraphs 78 to 93, EK needed Mr. Baxi's assistance in winding down the Indian office.

137.    Mr. Baxi was injured in an amount to be determined at trial but believed to be not less than $1.5 million.

### SIXTHCAUSE OF ACTION (EMPLOYMENT CONTRACT)
### (BREACH OF CONRACT)

138.    Plaintiff realleges all of the relevant paragraphs set forth above.

139.    As alleged above, including Paragraphs 51 to 66, in December 2009, Mr. Baxi and EK had an Oral Contract wherein Mr. Baxi was to be employed until November 30, 2010, at the very least.  Mr. Baxi was ready, willing, and able to perform his portion of the contract.

140.    EK breached by failing to pay Mr. Baxi his salary until November 30, 2010.

141.    EK interfered with Mr. Baxi's performance of his obligations under the valid and binding Oral Contract and violated the covenant of good faith and fair dealing inherent in every contract.

142.    EK's interference with Mr. Baxi's performance was malicious, and done in bad faith and with reckless disregard for the rights of Mr. Baxi and others.

143.    EK's breach of the Oral Contract caused Mr. Baxi substantial damages in an amount to be determined at trial.

144.    Mr. Baxi suffered damages in an amount to be determined at trial as a result of EK's interference with his performance of the valid and binding employment contract.

## SEVENTHCAUSE OF ACTION (SHARE ALLOCATION AGREEMENTS)
### (BREACH OF CONTRACT)

145.    Plaintiff realleges all of the relevant paragraphs set forth above.

146.    In 2002, 2005, and 2006, Mr. Baxi and EK entered into binding contracts wherein Mr. Baxi received a total of 1196 shares of EK stock that were granted to Mr. Baxi so that he could participate in the economic growth of the company.

147.    A term implied in every contract is that neither party will take opportunistic advantage of the other.  EK engaged in opportunistic misconduct by (i) purporting to terminate Mr. Baxi on February 2, 2010; (ii) actually keeping Mr. Baxi as an employee until September 10, 2010; (iii) engaging in such conduct in order to deprive Mr. Baxi of his *pro rata* share of the profits generated from the merger with Hewitt.

148.    EK denied Mr. Baxi the fruits of his labor and the benefits contemplated by the share allocation contracts by tricking Mr. Baxi into selling the shares back at less than fair value. Mr. Baxi was denied the opportunity to participate in the economic growth of EK.

149.    Moreover, even according to Defendants, Mr. Baxi was not actually terminated on February 2, 2010.  The earliest that Defendants purport to have actually terminated Mr. Baxi (as opposed to simply noticing a termination) was March 31, 2010, which is the last day for which Mr. Baxi ever got paid by EK.  The merger agreement with Hewittwas signed on July 2, 2010.

25

150. The agreements governing EK's grants of stock to Mr. Baxi provided that Mr. Baxi had 90 days after termination to sell his shares back to EK. Thus, although Defendants March 31, 2010 termination date seems random, it was not. March 31 was not selected because it marked the last day that Mr. Baxi was expected or needed to work for EK. Rather, it was selected because it was 92 days prior to the execution of the transaction between Hewitt and EK.

151. The fact that Mr. Baxi was asked to perform over 250 hours of work for EK after March 31 indicates that the Defendants opportunistically took Mr. Baxi off payroll on March 31 in order to avail themselves of the argument that Mr. Baxi was obligated to sell back his shares prior to the transaction between EK and Hewitt. But, as alleged above, EK's interference with Mr. Baxi's rights under the share allocation agreements was malicious, and done in bad faith and with reckless disregard for the rights of Mr. Baxi and others.

152. Mr. Baxi suffered damages in an amount to be determined at trial as a result of EK's violation of the covenants of good faith and fair dealing with regard to the valid and binding contracts that allocated him 1196 EK shares.

### EIGHTHCAUSE OF ACTION
### (PROMISSORY ESTOPPEL)

153. Plaintiff realleges all of the relevant paragraphs set forth above.

154. In December 2009, EK made a clear and unambiguous promise to Mr. Baxi that he would be employed by EK until at least November 30, 2010.

155. Mr. Baxi continued providing services to EK in reliance upon this clear and unambiguous promise.

156. EK knew that Mr. Baxi was relying upon this clear and unambiguous promise.

157. EK failed to pay Mr. Baxi the compensation that EK had promised it would pay to him.

158. Mr. Baxi suffered significant damages in an amount to be determined at trial as a

result of EK's failure to provide the compensation that it had promised.

## NINTH CAUSE OF ACTION
### (QUANTUM MERUIT)

159.    Plaintiff realleges all of the relevant paragraphs set forth above.

160.    At the request of EK, Mr. Baxi performed extensive high-quality services for EK in good faith.

161.    EK accepted the services performed by Mr. Baxi and publicly and privately expressed its satisfaction with the services.

162.    EK and Mr. Baxi both expected that Mr. Baxi would be compensated for the services that he performed.

163.    The services Mr. Baxi performed were of high-value and by failing to compensate him EK caused Mr. Baxi to suffer damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays that the Court enter judgment in his favor and against Defendants, as follows:

(A)    Awarding Plaintiff compensatory damages in an amount to be determined at trial but believed to be not less than $1,500,000

(B)    Awarding Plaintiff pre-judgment and post-judgment interest on such damages;

(C)    Ordering the rescission of the February 2, 2010 sale of Mr. Baxi's shares to EK or other equitable relief such that Mr. Baxi will realize the value of interest in EK;

(D)    Awarding Plaintiff the costs of this action;

(E)    Awarding Plaintiff attorneys' fees;

(F)    Awarding Plaintiff punitive damages in an amount to be determined at trial; and

(G)     Awarding Plaintiff such other and further relief as this Court deems just and

        proper.

Dated:  New York, New York
September 30, 2011

                                        Respectfully submitted,

                                        | **MANDEL BHANDARI LLP** |
                                        | :--- |
                                        | BY:  /s/ Rishi Bhandari_____ |
                                        | RISHI BHANDARI |
                                        | EVAN MANDEL |
                                        | Mandel Bhandari LLP |
                                        | 11 Broadway, Suite 615 |
                                        | New York, NY 10004 |
                                        | T:  (212) 269-5600 |
                                        | F:  (646) 964-6667 |
                                        | rb@mandelbhandari.com |
                                        | em@mandelbhandari.com |

28